COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Benton, Coleman, Elder,
         Bray, Bumgardner, Humphreys and Senior Judge Cole
Argued at Richmond, Virginia


RICKY ARNEZ CHRISTIAN
                                          OPINION BY
v.   Record No. 0558-98-1            JUDGE RICHARD S. BRAY
                                        NOVEMBER 7, 2000
COMMONWEALTH OF VIRGINIA


UPON A REHEARING EN BANC

FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
            Robert P. Frank, Judge

     (Robert Moody, IV; Timothy S. Fisher; Kinick,
     Segall, Moody & Lewis; Overman & Cowardin,
     P.L.C., on brief), for appellant.

     Shelly R. James, Assistant Attorney General
     (Mark L. Earley, Attorney General, on brief),
     for appellee.


     Ricky Arnez Christian (defendant) was convicted in a bench

trial for possession of cocaine with intent to distribute, a

violation of Code § 18.2-248, and related firearm offenses.  On

appeal, he complains that the trial court erroneously refused to

suppress evidence seized during an unlawful detention and,

additionally, challenges the sufficiency of the evidence to prove

the requisite intent to distribute the offending drugs.  Finding

no error, a panel of this Court affirmed the convictions.  Upon

rehearing en banc, we, likewise, affirm the trial court.

                           I.

Upon review of both a denial of a motion to suppress and a challenge to the sufficiency of the evidence, we consider the record in the light most favorable to the prevailing party below, the Commonwealth in this instance.  Bynum v. Commonwealth, 23 Va. App. 412, 414-15, 477 S.E.2d 750, 751-52 (1996).

On the evening of October 4, 1996, officers of the Newport News Police Narcotics Enforcement Unit were conducting a "drug reverse [sting] operation in Fairfield Apartments," undertaken in response to "a lot of complaints in reference to drug sales in that area," "a high drug area."  "[V]ice and narcotics" Officer W.L. Stokes acted as "security for two female officers [in "plain clothes"] who . . . were making sales of imitation cocaine to people who walked up or drove up in the area."  The undercover officers were equipped with hidden communication devices and, following each transaction, notified an "apprehension team," assembled in the laundromat office of a nearby apartment building, to arrest the purchaser.  The office, located "just inside the doorway" of the building, opened directly into a foyer, which also accessed two occupied apartments.

In the midst of the ongoing undercover police activity, at approximately 10:15 p.m., Officer Stokes noticed someone holding a "gun," walking directly toward the apartment building.  Via the communication link, he quickly advised the team that a person was approaching with "a gun in his hand."  Alerted by Stokes, Officer T.G. Lecroy, the team member assigned "to prevent anyone from getting hurt," observed the individual "come through the door, saw a gun, took the gun from him" and escorted him into the

"office area."[1]  Once inside, Lecroy immediately recognized defendant and, aware he was a convicted felon, arrested him for possession of the firearm.  A related search of defendant disclosed a plastic bag containing 2.3 grams of cocaine, a pager, and $935, "broken into nine $100 bundles," with the balance "just loose in his pocket."  No "means of ingesting" the cocaine was found on defendant's person.

After advising defendant of his Miranda rights, Lecroy "asked . . . how much cocaine he had started with," and defendant answered, "a large eight-ball," "drug . . . terminology" referencing one-eighth of an ounce of cocaine, approximately 3.5 grams.  Upon further inquiry, defendant stated that he obtained the cocaine from "Wooten," an individual known to Lecroy as "into dealing narcotics."

Officer M.L. Davenport, an expert in "drug matters," opined that possession of an "eightball" of cocaine, together with the pager, cash and weapon, was "inconsistent with personal use" of

---

[1] Asked on cross-examination, "why did you seize this gentleman," Lecroy responded,

> When we have undercover officers out in the parking lot which are conducting sales of illegal drugs, imitation illegal drugs, my concern is for their safety along with anyone else that I may be working with if I – and any other people who may be in the area.
>
> When I heard that a man had a gun in the middle of a high drug area which – which we wouldn't have been there if it wasn't a high drug area, then I'm going to take it from him and find out what his purpose is for being there.

the drug.  Davenport explained that a pager provides communication to "persons in the drug trade" and "weapons . . . a means of protection."  He noted that "large amounts of money" derived from "drug distribution" are oftentimes packaged in "hundred dollar increments" because "[i]t's easier to count."  On cross-examination, Davenport added that users of cocaine will, "in most cases," carry on their person "some means" of consuming the drug.  Questioned further, he approximated the "street value" of an "eightball" at "one fifty to two twenty-five."

Defendant testified that, on the day of arrest, he cashed his weekly "paycheck," "seven hundred and some dollars, . . . [and] arranged [his] money," commingling the funds with $500 already in his possession.  He subsequently purchased "about an eight-ball" of cocaine for personal use and "took [several] hits" in his wife's car before approaching the apartment building.  At the time of the offense, defendant was regularly earning $7.71 per hour over a forty-hour workweek, resulting in $251.28 net pay for the period.

II.

Defendant first complains that he was unlawfully seized by Officer Lecroy, requiring suppression of all evidence subsequently obtained by police.  See Mapp v. Ohio, 367 U.S. 643, 655 (1961).

"Ultimate questions of reasonable suspicion and probable cause to make a warrantless . . . seizure involve issues of both law and fact and are reviewed de novo on appeal."  Glasco v. Commonwealth, 26 Va. App. 763, 770-71, 497 S.E.2d 150, 153

(1998) (citation and internal quotations omitted).  However,

"[i]n performing such analysis, we are bound by the trial

court's findings of historical fact unless 'plainly wrong' or

without evidence to support them and we give due weight to the

inferences drawn from those facts by resident judges and local

law enforcement officers."  McGee v. Commonwealth, 25 Va. App.

193, 198, 487 S.E.2d 259, 261 (1997) (en banc) (citation

omitted).  "In reviewing a trial court's denial of a motion to

suppress, 'the burden is upon appellant to show that this

ruling, when the evidence is considered most favorably to the

Commonwealth, constituted reversible error.'"  Glasco, 26 Va.

App. at 770, 497 S.E.2d at 153 (citation omitted).

In resolving defendant's argument, we find it helpful to

revisit Terry v. Ohio, 392 U.S. 1 (1968), the landmark decision

of the Supreme Court of the United States that addressed the

Fourth Amendment implications of the detention and pat-down of a

citizen by police investigating suspicious conduct.  In Terry,

Cleveland Police Officer Martin McFadden, a detective with

thirty-five years experience, was patrolling the "vicinity . . .

downtown . . . for shoplifters and pickpockets" when his

"attention was attracted by" defendant and a companion "standing

on [a] corner."  Id. at 5.  As McFadden watched, each man in turn

repeatedly "walk[ed] . . . past some stores[,] . . . paused for a

moment and looked in a store window, . . . walked on . . .,

turned around" and returned to the corner to confer with the

other, "looking in the same window" en route.  Id. at 6.  After

ten or twelve minutes of such behavior, the two, then joined by a third man, "walked off." Id.

Suspicious that the men were "casing a job, a stick up," McFadden decided "that the situation was ripe for action," approached the three, identified himself and "asked for their names." Id. at 6-7. Receiving a "'mumbled' . . . 'response'" and fearful "'they may have a gun[,]'" he "grabbed [Terry], . . . spun him around . . ., and patted down the outside of his clothing[,]" discovering a pistol.[2] Id. Terry was then arrested and subsequently convicted of a weapons offense. Id. at 7. On appeal, he advanced a Fourth Amendment challenge to the constitutionality of the stop, seizure and search.

In affirming Terry's conviction, the Court recognized that "effective crime prevention and detection" often requires "swift action predicated upon the on-the-spot observations" of police. Id. at 20, 22. However, the Court cautioned that, to comport with the "Fourth Amendment's general proscription against unreasonable searches and seizures[,]" police acting in response to such circumstances "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant . . . intrusion" upon the protected interests of citizens.[3] Id. at 20-21. Thus, the dispositive inquiry becomes, "would the facts available to the

_____

[2] A similar search of the others revealed a second handgun. Id. at 7.

[3] The Court expressly noted that Terry's conduct, although "innocent in itself," became suspicious when "taken together" with other circumstances and "warranted further investigation." Id. at 22 (emphasis added).

officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?[,]" an objective test.  Id. at 21–22 (citation omitted).  If so, "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest."  Id. at 22.

The "crux" of Terry, however, was not the propriety of McFadden's "steps to investigate . . . suspicious behavior," but, rather, the "invasion of Terry's personal security by searching him for weapons in the course of that investigation[,]" an issue related to the more "immediate interest of the police officer in taking steps to assure . . . that the person . . . is not armed with a weapon that could . . . be used against him."  Id. at 23.  Unwilling to expose police to "unnecessary risks[,]" the Court refused to "blind [itself] to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest."  Id. at 23–24 (emphasis added).  Accordingly, "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would . . . be clearly unreasonable to deny . . . the power to take necessary measures to determine . . . and to neutralize the threat . . . ."  Id. at 24 (emphasis added).

Thus, like the objective test for reasonable suspicion, "the issue is whether the reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of

others was in danger." Id. at 27 (emphasis added). If so, police may undertake a search and related seizure appropriate to the "concrete factual circumstances of individual cases," "confined in scope to an intrusion reasonably designed to discover "hidden instruments" that threaten both police and others. Id. at 29.

Applying these companion principles to the facts in Terry, the Court noted that McFadden had observed Terry and his companions engage in a pattern of conduct which, though lawful, was "unusual" and reasonably supported a police officer, "experience[d] in the detection of thievery," in the "hypothesis that these men were contemplating a daylight robbery . . . likely to involve weapons." Id. at 23, 28. The Court, therefore, concluded that the circumstances provided sufficient justification for the encounter, seizure and "pat down" of Terry, limited acts "necessary for the protection of [McFadden] and others" in the pursuit of an appropriate investigation. Id. at 30.

Several years after deciding Terry, the Court, in Adams v. Williams, 407 U.S. 143 (1972), again considered the Fourth Amendment implications of an investigatory seizure and search of a citizen. There, Bridgeport Connecticut Police Sergeant John Connolly received a tip, deemed reliable by the Court, that Williams, then seated in a nearby vehicle, was "carrying narcotics and had a gun at his waist." Id. at 144-45. Connolly, alone at 2:15 a.m. on "car patrol duty" in a "high-crime area," "approached the vehicle to investigate the . . . report," "tapped on the car window and asked . . . Williams[] to open the door."

Id.  When Williams instead "rolled down the window[,]" Connolly "reached into the car and removed a fully loaded revolver from Williams' waistband."  Id. at 145.

In a resulting prosecution for illegal possession of the weapon, Williams challenged the admissibility of the evidence, complaining that it was the fruit of an unlawful search and seizure.  Id.  In affirming the conviction, the Supreme Court recalled the lessons of Terry, concluding that

> [t]he Fourth Amendment does not require a policeman . . . to simply shrug his shoulders and allow a crime to occur or a criminal to escape.  On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response.  A brief stop of a suspicious individual in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

Id. at 145-46 (citation omitted) (emphasis added).

Moreover, the Court again emphasized that police engaged in an "investigatory stop" "may conduct a limited protective search for concealed weapons" whenever justified in the belief that the subject is armed and dangerous.  Id. at 146.  Echoing Terry, the Court reasoned that such intrusion

> is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law.  So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a

> weapons search limited in scope to this
> <u>protective purpose</u>.

<u>Id.</u> (emphasis added).

In the years following <u>Terry</u>, <u>Williams</u> and their progeny,[4] our Court has frequently cited such decisions with approval, incorporating the attendant principles as familiar guideposts in our jurisprudence. Faithful to the rationale of <u>Terry</u>, we have resolved countless fact-specific "stop and frisk" appeals, consistently instructing that

> "[t]here is no 'litmus test' for reasonable
> suspicion. Each instance of police conduct
> must be judged for reasonableness in light
> of the particular circumstances." "In order
> to determine what cause is sufficient to
> authorize police to stop a person,
> cognizance must be taken of the 'totality of
> the circumstances -- the whole picture.'"

<u>Harmon v. Commonwealth</u>, 15 Va. App. 440, 445, 425 S.E.2d 77, 79 (1992) (citations omitted). Circumstances we have recognized as relevant in a <u>Terry</u>/<u>Williams</u> analysis include characteristics of the area surrounding the stop, the time of the stop, the specific conduct of the suspect individual, the character of the offense

---

[4] Recently, in <u>Illinois v. Wardlow</u>, 120 S. Ct. 673 (2000), the Court once more reaffirmed <u>Terry</u>, approving an investigatory stop and related "pat-down search" of a citizen pursued and detained after fleeing at the sight of police. <u>Id.</u> at 675-77. The Court acknowledged "that there are innocent reasons for flight from police," <u>id.</u> at 677, but reasoned that "[h]eadlong flight – whenever it occurs – is the consummate act of evasion: it is not necessarily indicative of wrongdoing but . . . certainly suggestive of such." <u>Id.</u> at 676. Thus, again, the reasonable suspicion requisite to a <u>Terry</u> stop arose from lawful conduct that assumed a suspicious appearance when viewed with "commonsense judgments and inferences about human behavior." <u>Id.</u> Doubtless, such investigatory authority clearly imposes the "risk that officers may stop innocent people," but "<u>Terry</u> accepts the risk," permitting a "minimal intrusion . . . allowing [police] to investigate further." <u>Id.</u> at 677.

under suspicion,[5] and the unique perspective of a police officer trained and experienced in the detection of crime. Williams v. Commonwealth, 4 Va. App. 53, 67, 354 S.E.2d 79, 86-87 (1987).

Here, police observed defendant suddenly appear, displaying a firearm, late at night, in an area notorious for "drug sales." Defendant's presence coincided with an ongoing police operation that involved several undercover officers in the sale of imitation illegal drugs, clearly an environment conducive to unlawful conduct and fraught with danger. With weapon in hand, defendant proceeded directly to an apartment building occupied both by police and residents. Confronted with such circumstances, police, experienced in the deadly mix of guns and narcotics and other violent crimes, reasonably suspected criminal activity which posed an immediate threat both to themselves and others, justifying a brief investigatory detention. In undertaking the encounter, Lecroy, the officer responsible for operational safety, was entitled to seize defendant and take control of the weapon, thereby neutralizing an imminent threat in a prudent and measured fashion. Had police ignored the full import of defendant's conduct, although perhaps facially lawful, and a tragedy resulted, the folly of such indifference would have been apparent.

When, during the course of the stop, defendant was identified as a person then involved in felonious activity,

---

[5] "The relationship between the distribution of controlled substances, . . . and the possession and use of dangerous weapons is now well recognized." Logan v. Commonwealth, 19 Va. App. 437, 445, 452 S.E.2d 364, 369 (1994) (en banc).

police properly effected his arrest and undertook the disputed search.

                                    III.

Defendant next contends that the evidence was insufficient to prove an intention to distribute the cocaine in his possession.

The credibility of a witness, the weight accorded testimony, and the inferences drawn from proven facts are matters to be determined by the fact finder.  See Long v. Commonwealth, 8 Va. App. 194, 199, 379 S.E.2d 473, 476 (1989).  "Circumstantial evidence may establish the elements of a crime, provided it excludes every reasonable hypothesis of innocence."  Lovelace v. Commonwealth, 27 Va. App. 575, 586, 500 S.E.2d 267, 272 (1998).  "Whether a hypothesis of innocence is reasonable is a question of fact and a finding by the trial court is binding on appeal unless plainly wrong."  Id. at 586, 500 S.E.2d at 273 (citation omitted).

"[F]or a defendant to be convicted of possession of a controlled substance with the intent to distribute, the Commonwealth must prove that the defendant possessed the controlled substance contemporaneously with his intention to distribute that substance."  Stanley v. Commonwealth, 12 Va. App. 867, 869, 407 S.E.2d 13, 15 (1991) (en banc).  "Because direct proof of intent [to distribute drugs] is often impossible, it must be shown by circumstantial evidence."  Servis v. Commonwealth, 6 Va. App. 507, 524, 371 S.E.2d 156, 165 (1988).  Such evidence may

include the possession of large sums of money, pagers, and firearms, "regularly recognized as factors indicating an intent to distribute."  Glasco, 26 Va. App. at 775, 497 S.E.2d at 156.

Officer Lecroy discovered 2.3 grams of cocaine, together with a pager, $935 "broken down into nine $100 bundles," and a firearm on defendant's person, an aggregation of circumstances inconsistent with personal use of the drug.  Moreover, defendant possessed no paraphernalia necessary to the consumption of cocaine.  Although defendant testified that he possessed the drugs for personal use and attributed the cash to wages, the evidence proved otherwise, and "[t]he trial court was entitled to disbelieve [defendant's] explanation and conclude that he lied to conceal his guilt."  Dunbar v. Commonwealth, 29 Va. App. 387, 394, 512 S.E.2d 823, 827 (1999).  Such evidence sufficiently established that defendant possessed the cocaine with the requisite intent to distribute.

Accordingly, we affirm the convictions.

Affirmed.

Benton, J., with whom Elder, J., joins in Part I, dissenting.

                              I.

    "[A] police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest."  Terry v. Ohio, 392 U.S. 1, 22 (1968).

> The Fourth Amendment, of course, "applies to
> all seizures of the person, including
> seizures that involve only a brief detention
> short of traditional arrest.  '[W]henever a
> police officer accosts an individual and
> restrains his freedom to walk away, he has
> "seized" that person,' and the Fourth
> Amendment requires that the seizure be
> 'reasonable.'"

Brown v. Texas, 443 U.S. 47, 50 (1979) (citations omitted).  "The controlling principle here is that an investigative stop, amounting to a fourth amendment seizure, must be 'supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity.'"  United States v. Gooding, 695 F.2d 78, 82 (4th Cir. 1982) (quoting Reid v. Georgia, 448 U.S. 438, 440 (1980)).

    The police officers who seized Ricky Christian had no reasonable or articulable suspicion that he was engaged in criminal activity.  Indeed, Officer Lecroy gave the following reason for detaining Christian:

> The reason that I did what I did, was
> because part of my job that evening was to
> prevent anyone from getting hurt, and to

apprehend suspects who may have purchased illegal narcotics.

When we have undercover officers out in the parking lot which are conducting sales of illegal drugs, imitation illegal drugs, my concern is for their safety along with anyone else that I may be working with if I -- and any other people who may be in the area.

When I heard that a man had a gun in the middle of a high drug area which -- which we wouldn't have been there if it wasn't a high drug area, then I'm going to take it from him and find out what his purpose is for being there.

The officer testified, however, that Christian did not purchase any drugs and was not suspected of drug activity. The officer had no indication that Christian was or had been engaged in criminal activity. He had no objective basis to believe that Christian, who was going to his home, "may have purchased illegal narcotics" from the undercover officers. Moreover, it is not illegal in Virginia to carry a gun if one is lawfully permitted to do so and if the gun is not held in a reckless or threatening manner. See Code § 18.2-56.1 and Code § 18.2-282.

Christian lived in one of the apartments in the building where he was arrested. Christian did not approach the officers who were selling the imitation cocaine, and he posed no threat to them. The evidence merely proved that he entered the apartment building where he lived. Moreover, no evidence proved that Christian was going to the laundry room or posed a threat to the officers who were waiting in the laundry room. Those

officers were out of sight of persons who may have been using the apartment's entrance and lobby. Indeed, Officer Lecroy left the laundry room to confront Christian. A conclusion that Christian posed a threat to the officers or anyone else would be based on "sheer speculation, unsupported by the evidence." Tucker v. Life Ins. Co. of Va., 228 Va. 55, 62, 321 S.E.2d 78, 82-83 (1984).

The only objective facts upon which the police relied to seize Christian were that he was carrying a weapon in public in "a high drug area." However, carrying an openly displayed firearm in public is not illegal in Virginia. Indeed, if a person desires to transport a firearm from his automobile to his residence, the firearm must be openly displayed. Cf. Code § 18.2-308 (prohibiting generally the carrying of concealed weapons). The record contains no indication that Christian was "brandishing" a firearm in violation of Code § 18.2-282(A). In a state that permits ownership and open display of firearms, the mere fact that a person may be armed does not provide a reason to suspect that the person is violating the law.

Moreover, "the characteristic of an area cannot serve to impute criminal activity to a person by virtue of that person's presence in the area." Riley v. Commonwealth, 13 Va. App. 494, 498-99, 412 S.E.2d 724, 726 (1992). In Brown, the United States Supreme Court has also noted that a neighborhood's

characteristic tells nothing about the conduct of the person in it.

> The flaw in the State's case is that none of the circumstances preceding the officers' detention of appellant justified a reasonable suspicion that he was involved in criminal conduct.  Officer Venegas testified at appellant's trial that the situation in the alley "looked suspicious," but he was unable to point to any facts supporting that conclusion.  There is no indication in the record that it was unusual for people to be in the alley.  The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct.  In short, the appellant's activity was no different from the activity of other pedestrians in that neighborhood.  When pressed, Officer Venegas acknowledged that the only reason he stopped appellant was to ascertain his identity.  The record suggests an understandable desire to assert a police presence; however, that purpose does not negate Fourth Amendment guarantees.

Brown, 443 U.S. at 51-52 (footnote omitted); see also Sibron v. New York, 392 U.S. 40, 62 (1968) (holding that "[t]he inference that persons who talk to narcotic addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security").

> "It cannot be reasonably inferred from the mere presence of the defendant at the street intersection and the intersection's reputation as a place for trafficking in drugs that [defendant] was engaged in the illegal activity of drug distribution over the period of time defendant was observed by the detectives."

\* \* \* \* \* \* \*

> "[T]housands of citizens live and go about their legitimate day-to-day activities in areas which surface . . . in court testimony, as being high crime neighborhoods. The fact that the events here at issue took place at or near an allegedly 'high narcotics activity' area does not objectively lend any sinister connotation of facts that are innocent on their face."

Riley, 13 Va. App. at 498, 412 S.E.2d at 726-27 (citations omitted).

The recent case Illinois v. Wardlow, 120 S. Ct. 673 (2000), reaffirmed the basic principles embodied in Terry and held that "[h]eadlong flight" in an area known for criminal activity gave the police reasonable suspicion to search a suspect. 120 S. Ct. at 676. Nevertheless, the Court also stated that "it was not merely [the suspect's] presence in an area of heavy narcotics trafficking that aroused the officers' suspicion." Id. Such presence, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. Id. In this case, Christian's presence in a high crime neighborhood was the only cause for suspicion about his activities. As stated earlier, his open possession of the firearm was proof only of lawful compliance with the Virginia statute. When the circumstances objectively establish perfectly lawful activity, no cause exists for reasonable suspicion of criminal activity.

To make a Terry stop, "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981). In both Terry and Adams v. Williams, 407 U.S. 143 (1972), the police officers were able to articulate a particularized suspicion that the person was engaged in criminal activity. See Terry, 392 U.S. at 6-7; Williams, 407 U.S. at 144-48.

The evidence does not prove that Christian was engaged in criminal activity or was "presently dangerous" to the officers or any other person. See Terry, 392 U.S. at 24. Thus, Officer Lecroy was not justified in his "belief that his safety or that of others was in danger." Id. at 27. For these reasons, I would hold that the trial judge erred in refusing to suppress the evidence.

## II.

Although the evidence was sufficient to prove possession of cocaine, it was insufficient to establish an intent to distribute beyond a reasonable doubt. Therefore, I dissent.

"Possession with intent to distribute is a crime which requires 'an act coupled with a specific intent.'" Stanley v. Commonwealth, 12 Va. App. 867, 869, 407 S.E.2d 13, 15 (1991) (en banc) (citation omitted). "It is elementary that where, as here, an indictment charges an offense which consists of an act combined with a particular intent, proof of the intent is

essential to conviction."  Patterson v. Commonwealth, 215 Va. 698, 699, 213 S.E.2d 752, 753 (1975).  The Commonwealth must prove specific intent, an element of the charged offense, beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 315-16 (1979); In re Winship, 397 U.S. 358, 363 (1970).  Thus, "[e]xistence of the intent . . . cannot be based upon surmise or speculation."  Patterson, 215 Va. at 699, 213 S.E.2d at 753.

When the Commonwealth's evidence is wholly circumstantial, 'all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence.'"  Dukes v. Commonwealth, 227 Va. 119, 122, 313 S.E.2d 382, 383 (1984) (quoting Inge v. Commonwealth, 217 Va. 360, 366, 228 S.E.2d 563, 567 (1976)). "Where inferences are relied upon to establish guilt, they must point to guilt so clearly that any other conclusion would be inconsistent therewith."  Dotson v. Commonwealth, 171 Va. 514, 518, 199 S.E. 471, 473 (1938).

The principle is well established in Virginia that a relatively small quantity of cocaine warrants the inference that an accused possessed it for personal use.  See Dukes, 227 Va. at 122-23, 313 S.E.2d at 383-84.  The police seized only 2.3 grams of cocaine from Christian's person.  No other evidence indicated an intent to distribute.  "The mode of packaging [of the cocaine] and the way the [package was] hidden are as consistent with possession for personal use as they are with intent to

distribute."  Id. at 123, 313 S.E.2d at 384.  The cocaine was not divided into individual and separate packages.

Moreover, Christian made no statements and committed no acts that proved he intended to distribute the cocaine. Christian had entered the building where he lived when the officer seized him.  The police officer testified that Christian said he purchased an "eight-ball."  The Commonwealth's evidence established that an eight-ball was approximately 3.5 grams and that if Christian began with an eight-ball, he was "missing" only a little over a gram of cocaine.  In addition, the Commonwealth's own expert testified that it would be impossible to obtain $900 from the sale of a little over a gram of cocaine.

Christian's wife testified that the day Christian was arrested (October 4, 1996), she had driven him to the bank to cash his paycheck of "about seven hundred dollars."  Christian testified as follows about his check:

> I cashed my check.  My check was like, seven
> hundred and some dollars.  We worked seven
> days on -- thirteen days on and four days
> off.  We worked ten-hour shifts a day.  So I
> cashed my check.  I asked the teller not to
> give me any hundred dollar bills and as few
> fifties as possible.  I arranged my money.

That testimony was not contradicted.  The probation officer testified that Christian reported to him on September 11, that he had gotten a new job with the railroad company and showed him a paystub with a "net pay [of] 251.28" for the week ending "9-7-96."

Thus, only through speculation could we conclude that a connection exists between Christian's money and his intention regarding the cocaine.  Likewise, proof that Christian possessed a pager, a very common device in our society, does not establish any intent regarding the cocaine.  "[C]ircumstances of suspicion, no matter how grave or strong, are not proof of guilt sufficient to support a verdict of guilty."  <u>Clodfelter v. Commonwealth</u>, 218 Va. 619, 623, 238 S.E.2d 820, 822 (1977).

For these reasons, I would also hold that the evidence failed to prove beyond a reasonable doubt that Christian possessed the cocaine with the intent to distribute.

Elder, J., concurring, in part, and dissenting, in part.

I concur with the majority as to Issue III, sufficiency of the evidence, and join Judge Benton's dissent as to Issue II, the seizure of the defendant.