COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Frank and Humphreys
Argued at Richmond, Virginia


RYLAND THOMAS MUSE

                                            MEMORANDUM OPINION[*] BY
v.        Record No. 1556-03-2              JUDGE ROBERT J. HUMPHREYS
                                                    JUNE 22, 2004
COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                            Bradley B. Cavedo, Judge

            Gregory W. Franklin, Senior Appellate Defender (Office of the
            Public Defender, on briefs), for appellant.

            Paul C. Galanides, Assistant Attorney General (Jerry W. Kilgore,
            Attorney General, on brief), for appellee.


        Ryland T. Muse appeals from his bench trial conviction for possession of cocaine with

intent to distribute, in violation of Code § 18.2-248.  Muse contends the trial court should have

suppressed the cocaine found following a weapons pat down because the pat down was

unreasonable under the circumstances.  Muse further contends the evidence was insufficient to

prove he possessed the cocaine with intent to distribute it.  For the reasons that follow, we affirm

Muse's conviction.

        On appeal of the denial of a motion to suppress, we consider the evidence adduced at

both the suppression hearing and the trial, DePriest v. Commonwealth, 4 Va. App. 577, 583, 359

S.E.2d 540, 542-43 (1987), and we view it in the light most favorable to the Commonwealth,

Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991).  "[W]e are

bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to

_____

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

support them." McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (*en banc*). However, we review *de novo* the trial court's application of legal standards such as reasonable suspicion to the particular facts of the case. Ornelas v. United States, 517 U.S. 690, 699 (1996).

As the trial court found here, no seizure occurred when Officer Davenport initially approached Muse on the public street. See Payne v. Commonwealth, 14 Va. App. 86, 88, 414 S.E.2d 869, 869-70 (1992) (discussing three types of encounters with the police: consensual, investigatory, and arrest); see also Walker v. Commonwealth, 42 Va. App. 782, 595 S.E.2d 30 (2004). However, when Officer Davenport frisked Muse, or "patted" him down, the encounter took the form of a seizure. At that point, a reasonable person would not have believed he could ignore the officer's requests and walk away. Toliver v. Commonwealth, 23 Va. App. 34, 36, 473 S.E.2d 722, 724 (1996) ("While being frisked, no reasonable person would feel free to walk away.").

Nevertheless, we find that Officer Davenport possessed the requisite reasonable suspicion to briefly detain Muse and investigate the circumstances. We further find that Officer Davenport possessed a reasonable suspicion that Muse was armed and dangerous. See Terry v. Ohio, 392 U.S. 1, 32-33 (1968) (Harlan, J., concurring) ("[P]olicemen have no more right to 'pat down' the outer clothing of passers-by, or persons to whom they address casual questions, than does any other citizen. . . . [I]f the frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a forcible stop."); United States v. Burton, 228 F.3d 524, 528 (4th Cir. 2000) ("Once an officer has a basis to make a lawful investigatory stop, he may protect himself during that stop by conducting a search for weapons if he 'has reason to believe that the suspect is armed and dangerous.'" (quoting Adams v. Williams, 407 U.S. 143, 146 (1972))).

First, "[t]o conduct an investigatory stop, a police officer must have reasonable, articulable suspicion that a specific individual is engaged in criminal activity." Walker, 42 Va. App. at 790, 595 S.E.2d at 34. "'To determine whether a police officer had a particularized and objective basis for suspecting that the person stopped may be involved in criminal activity, a court must consider the totality of the circumstances.'" Id. (quoting Whitfield v. Commonwealth, 265 Va. 358, 361, 576 S.E.2d 463, 465 (2003)). Actual proof that "criminal activity is afoot is not necessary" — the investigating officer need only have reason to believe that such criminal activity "may be afoot." Harmon v. Commonwealth, 15 Va. App. 440, 444, 425 S.E.2d 77, 79 (1992); see also United States v. Arvizu, 534 U.S. 266, 273 (2002). Though an officer's reliance on a mere hunch cannot justify a stop, United States v. Sokolow, 490 U.S. 1, 7 (1989), "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." Arvizu, 534 U.S. at 274. "'Circumstances we have recognized as relevant [to this determination] . . . include characteristics of the area surrounding the stop, the time of the stop, the specific conduct of the suspect individual, the character of the offense under suspicion, and the unique perspective of a police officer trained and experienced in the detection of crime.'" Walker, 42 Va. App. at 791, 595 S.E.2d at 34 (quoting Christian v. Commonwealth, 33 Va. App. 704, 714, 536 S.E.2d 477, 482 (2000) (*en banc*)). For instance,

> [i]n United States v. Mayo, [381 F.3d 802 (4th Cir. 2004)], the
> Fourth Circuit overturned the district court's grant of a motion to
> suppress evidence that the police found while conducting a Terry
> stop and pat down. The court found the police had reasonable
> suspicion to stop Mayo, based on the totality of the circumstances.
> Those circumstances included 1) the encounter occurred in a
> high-crime area, 2) Mayo's hand movements suggested he was
> engaged in an illegal activity [(possessing a concealed weapon
> without a permit)], 3) Mayo attempted to avoid police scrutiny, and

- 3 -

4) Mayo behaved nervously when approached by the police. Id. at [807-08].

Walker, 42 Va. App. at 791, 595 S.E.2d at 34-35.

Here, Officer Donald Davenport, of the Richmond Police Department, first observed the car Muse was in driving in an area of Richmond known as "the most productive open-air [drug] market . . . in first precinct." The driver of the car was driving "rather slowly," "probably 10 miles per hour or less." Muse was in the backseat.

Officer Davenport followed behind the car as the driver twice "ma[de] a big circle in that area" and twice "pulled over."[1] The second time the car pulled over, Muse got out of the car and began walking on the sidewalk, in the direction of Officer Davenport's patrol car. At that point, Officer Davenport leaned outside of his patrol car and asked Muse if he could talk with him. Muse replied, "yeah," and Officer Davenport asked him his name. Muse appeared "unusually nervous" and after some hesitation, said that his name was Earnest Woodley.[2] When Officer Davenport asked Muse "what he was doing in the area," Muse replied that he was "going to visit" "Earnest." Muse appeared "confused" and gave Officer Davenport several birth dates that

---

[1] We disagree with the interpretation of the record footnoted in the dissent. In our view and considering the evidence in the light most favorable to the Commonwealth as the party prevailing below as we must, we conclude that the record demonstrates that the car circled the block more than once. Indeed, in addition to the nature of the area ("the most productive open-air [drug] market") and the fact that the car was traveling slowly, Officer Davenport testified "the reason that [he] had contact" was because he "noticed the [car] traveling in a circle." After he observed the car "pull[] over at one point in time, stop[], and enter[] the flow of traffic again," he became suspicious so he "continued behind the [car]." The car then "traveled around in a circle and then pulled over again." Officer Davenport testified that "[after] he picked [Muse] up" they made the circle around the block "probably one time." Thus, in our view and considering the evidence based on the standard of review articulated above, the record clearly reflects that the car Muse was in was already "circling" the "area" when Officer Davenport first observed him. After Officer Davenport began to follow the car (just before the initial stop), the car made "probably one" full circle, before stopping at the same "spot" it had stopped at before.

[2] After arresting Muse, police determined that his name was actually Ryland Muse.

- 4 -

were inconsistent with the age he provided Officer Davenport. Muse "bec[ame] more nervous during [the] entire conversation," "looking around from left to right," and "shifting" his feet.

At that time, Officer Davenport asked Muse to point to the "house [he] was going to." Muse did so, and Officer Davenport sent another officer "to check and see if anybody was there." When the other officer returned, he told Davenport, "[N]o, nobody there knows him."

Officer Davenport then observed "a rather distinct bulge on the left side of [the] Army field jacket" Muse was wearing. For "[his] safety," Officer Davenport "patted [Muse] down." As Officer Davenport "placed both hands and went down both sides of the jacket," he felt a bulge of "metal material" on the left side. "Simultaneously, [Officer Davenport's] right hand was on the other side pocket, and immediately, without manipulation of anything, [he] felt a cylindrical hard object, which [he] identified to be a hypodermic needle." Officer Davenport looked inside Muse's left pocket and saw that the "metal" object was an empty "Coke can." He then asked Muse if he was diabetic. Muse replied that he was not.

Subsequently, Officer Davenport "went inside and retrieved the [syringe]" which he believed to be "illegal." Davenport noticed that there was liquid inside the hypodermic needle. Because he believed the liquid was heroin, he placed Muse under arrest and conducted a full search of Muse's person incident to that arrest. Davenport found a pill bottle containing eight aluminum packets of an "off-white rock substance," which he believed to be cocaine, as well as $347 in currency.

The trial court denied Muse's motion to suppress, finding, in relevant part:

> I don't think any one factor is enough to get to the pat-down, but the cases say that you can look at the totality of the circumstances. And I believe that under the totality of the circumstances that [Officer Davenport] testified to, the Terry stop was appropriate. It was lawful.
>
> The driving, the circling the block, certainly is consistent with Mr. Muse's testimony that he was looking for a particular place. He

may not have known exactly where it was and so forth. Yet given the nature of the neighborhood that Officer Davenport was familiar with, being the highest productive area in terms of drug arrests in his precinct, it was consistent with unusual or suspicious behavior from his experience, something that merited further observation.

For these same reasons – specifically, the nature of the place, Muse's hesitant and nervous behavior, his confused and inconsistent responses, as well as his overall demeanor - we find that Officer Davenport possessed knowledge of objective facts sufficient to give him reasonable suspicion to stop Muse and investigate his actions. See Andrews v. Commonwealth, 37 Va. App. 479, 491, 559 S.E.2d 401, 407 (2002) (internal quotations omitted) (noting that in determining whether an officer possessed reasonable suspicion to justify an investigatory stop and pat-down search, "[t]he officer is . . . entitled to view the circumstances confronting him in light of his training and experience, and he may consider any suspicious conduct of the suspected person" and "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior").

Nevertheless, as indicated above, "[t]o conduct a pat-down search during a Terry stop, an officer must have reasonable, articulable suspicion that the individual might be armed and dangerous, in addition to the reasonable suspicion of criminal behavior." Walker, 42 Va. App. at 791, 595 S.E.2d at 35. "The circumstances that a court can consider when determining whether an officer had reasonable suspicion include the nature of the area in which the stop occurred, the time of day, the conduct and demeanor of the suspect, and the type of offense that the officer was investigating." Id. at 791-92, 595 S.E.2d at 35. Considering these factors, we find Officer Davenport likewise had a reasonable, articulable suspicion that Muse was armed and dangerous.

As the trial court noted,

> When Mr. Muse got out of the car, I think the officer was within his rights to ask, can I talk to you, and that conversation was consensual conversation. And I think further circumstances appeared in that conversation, which gave Officer Davenport

- 6 -

> pause, gave him a reason to believe that Mr. Muse was nervous. His nervousness . . . made Officer Davenport nervous and concerned for his own safety, that in connection with the bulge that he observed in the coat Mr. Muse was wearing.
>
> But I think even without the bulge, the pat-down would have been appropriate at that point, given the coat that Mr. Muse was wearing, which he's wearing here today in court. But with the bulge, I think it was appropriate to do the search for his safety.

Based upon these circumstances – in particular, the nature of the area ("the most productive open-air drug market"), the nature of Muse's clothing (the Army jacket), the "distinct bulge" in Muse's jacket, and Muse's hesitant and nervous behavior - we find Officer Davenport, a trained police officer, had sufficient objective facts before him to justify the pat-down search of Muse. Cf. James v. Commonwealth, 22 Va. App. 740, 745-46, 473 S.E.2d 90, 92 (1996) (finding officer justified in conducting a pat-down search for weapons based on a passenger's "jittery" behavior, nervousness, and failure to keep his hands where they could be seen); Walker, 42 Va. App. at 792, 595 S.E.2d at 35 (finding officer justified in conducting a pat-down search for weapons based upon appellant's presence in a known drug area at 11:00 at night, as well as appellant's behavior of attempting to hide an item in someone else's pocket when the officer approached, and refusing to remove his hand from his own pocket when ordered to by the officer); Mayo, 361 F.3d at 807-08.

Furthermore, contrary to Muse's contention on appeal, it is of no moment that Officer Davenport patted down both of Muse's pockets – the left with the bulge, as well as the right, which had no noticeable bulge. As Muse recognizes, protective frisks are justified for the purposes of the protection of police and others nearby, and they "must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry, 392 U.S. at 29-30. Officer Davenport's "simultaneous" pat down of Muse's outer clothing was properly within this scope. Id. at 30

(recognizing that, under the appropriate circumstances, an officer "is entitled for the protection of himself and others in the area to conduct a carefully limited search of the *outer clothing* of such persons in an attempt to discover weapons which might be used to assault him" (emphasis added)); see also Adams, 407 U.S. at 146 ("The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.").

Accordingly, because we find that the stop and pat-down search were based upon reasonable suspicion, we hold that the trial court did not err in denying Muse's motion to suppress.

Furthermore, we find no merit in Muse's final contention that the evidence was insufficient to support his conviction for possession of cocaine with intent to distribute. It is well settled that

> [o]n appeal, we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. The judgment of a trial court sitting without a jury is entitled to the same weight as a jury verdict and will not be set aside unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it.

Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987) (citing Code § 8.01-680). Moreover, the "credibility of a witness, the weight accorded the testimony, and the inferences to be drawn from proven facts are matters *solely* for the fact finder's determination." Crawley v. Commonwealth, 29 Va. App. 372, 375, 512 S.E.2d 169, 170 (1999) (emphasis added).

During Muse's trial, Officer Davenport testified that, upon searching Muse incident to arrest, he found a pill bottle in Muse's pants pocket. The pill bottle contained eight, individually wrapped, aluminum packets of "an off-white rock believed to be crack cocaine." The substance was later determined to be 1.284 grams of cocaine. Officer Davenport also recovered $347 in currency from Muse – four $50 bills, six $20 bills, one $10 bill, three $5 bills and two $1 bills.

- 8 -

Perhaps more significantly, Davenport stated that after he read Muse his <u>Miranda</u> rights and Muse waived those rights, he asked Muse if he used cocaine. Muse replied that he did not use cocaine, but that he used heroin. When Officer Davenport asked Muse why he had the cocaine, Muse stated that he "used cocaine in exchange for rides."[3]

After being "qualified as an expert witness in the City of Richmond as to drug distribution," Sergeant David Selander testified that crack cocaine cannot be ingested by use of a syringe. He further stated that crack cocaine is typically packaged for sale in "individual packages of small rocks," which range in price "from 15 to 20 dollars." Although "infrequently," he testified that he had observed crack cocaine packaged for sale in aluminum foil. Finally, Sergeant Selander testified that the amount of crack cocaine found on Muse's person was inconsistent with personal use.

"Because direct proof of intent [to distribute drugs] is often impossible, it must be shown by circumstantial evidence." <u>Servis v. Commonwealth</u>, 6 Va. App. 507, 524, 371 S.E.2d 156, 165 (1988). "Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." <u>Coleman v. Commonwealth</u>, 226 Va. 31, 53, 307 S.E.2d 864, 876 (1983). However, "[t]he Commonwealth need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant." <u>Hamilton v. Commonwealth</u>, 16 Va. App. 751, 755, 433 S.E.2d 27, 29 (1993). Thus, we must determine "not whether there is some evidence to support" the appellant's hypothesis of innocence, but, rather, "whether a reasonable [fact finder], upon consideration of all the evidence, could have rejected [appellant's] theories in his defense and found him guilty of [the charged crime] beyond

---

[3] During the hearing on Muse's pretrial motion to suppress, Officer Davenport testified that Muse also told him he would exchange the cocaine for heroin. However, that evidence was not incorporated for purposes of Muse's trial.

a reasonable doubt." Commonwealth v. Hudson, 265 Va. 505, 513, 578 S.E.2d 781, 785 (2003) (internal quotations omitted). Whether an alternate hypothesis of innocence is reasonable is a question of fact and is binding on appeal unless plainly wrong. Archer v. Commonwealth, 26 Va. App. 1, 12-13, 492 S.E.2d 826, 832 (1997).

Viewed in its totality, we find that the evidence here clearly supported the trial court's determination that Muse possessed the crack cocaine with the intent to distribute it. See Hudson, 265 Va. at 514, 578 S.E.2d at 786 ("[C]ircumstantial evidence is not viewed in isolation."). Indeed, factors that may support a theory that a defendant intended to distribute illegal drugs in his possession include the "[p]ossession of a quantity [of drugs] greater than that ordinarily possessed for one's personal use," Iglesias v. Commonwealth, 7 Va. App. 93, 110, 372 S.E.2d 170, 180 (1988) (*en banc*), "[t]he method of packaging of the controlled substance," Servis, 6 Va. App. at 524, 371 S.E.2d at 165, the quantity and denomination of the cash possessed, see Emerson v. Commonwealth, ___ Va. App. ___, ___ S.E.2d ___ (June 8, 2004); Welshman v. Commonwealth, 28 Va. App. 20, 37, 502 S.E.2d 122, 130 (1998), "the absence of any paraphernalia suggestive of personal use," Welshman, 28 Va. App. at 37, 502 S.E.2d at 130, and the presence of "equipment related to drug distribution." McCain v. Commonwealth, 261 Va. 483, 493, 545 S.E.2d 541, 547 (2001).

Considering these factors, in conjunction with Muse's statement that he "used cocaine in exchange for rides," we decline Muse's invitation to reweigh the evidence on appeal, and find that the trial court properly found the evidence presented by the Commonwealth was sufficient to support his conviction for possession of cocaine with intent to distribute.

We, thus, affirm the trial court's judgment.

Affirmed.

Elder, J., dissenting:

I would hold Officer Davenport lacked reasonable suspicion to believe appellant was engaged in criminal activity and, thus, that the weapons frisk was unreasonable. Because I believe the officer found the cocaine in a search incident to appellant's arrest for possession of items the officer found during the illegal frisk, I would hold the discovery of the cocaine was tainted by the illegal frisk and should have been suppressed. Thus, I would reverse appellant's conviction without reaching the sufficiency issue and dismiss the indictment.

In order to conduct a pat-down weapons frisk, an officer must (1) rightly be in the presence of the party frisked so as to be endangered if the person is armed, see 4 Wayne R. LaFave, Search and Seizure § 9.5(a), at 246 (3d ed. 1996), and (2) have reasonable suspicion that the person may, in fact, be armed and dangerous, see, e.g., Phillips v. Commonwealth, 17 Va. App. 27, 30, 434 S.E.2d 918, 920 (1993). The requirement that an officer be rightly in the presence of the person frisked means that the officer must have a duty to be in the person's presence, such as to conduct an investigatory stop. See 4 LaFave, supra, § 9.5(a), at 247 (citing Terry v. Ohio, 392 U.S. 1, 32-33, 88 S. Ct. 1868, 1885-86, 20 L. Ed. 2d 889 (1968) (Harlan, J., concurring)). "[A] frisk for self-protection cannot be undertaken when the officer has unnecessarily put himself in a position of danger by not avoiding the individual in question." Id.

As the trial court found, the encounter was consensual when it began but became a seizure when Officer Davenport conducted a pat-down search of appellant for weapons. "While being frisked, no reasonable person would feel free to walk away." Toliver v. Commonwealth, 23 Va. App. 34, 36, 473 S.E.2d 722, 724 (1996). Because appellant did not consent to be frisked, the Fourth Amendment required that Officer Davenport have "a 'reasonable suspicion supported by articulable facts [both (1)] that criminal activity "may be afoot,"'" United States v. Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1 (1989), and (2) that appellant

- 11 -

was armed and dangerous, see, e.g., Adams v. Williams, 407 U.S. 143, 146, 92 S. Ct. 1921, 1923, 32 L. Ed. 2d 612 (1972) (noting that officer may frisk suspect for weapons during Terry stop only if officer also "has reason to believe that the suspect is armed and dangerous"). See United States v. Burton, 228 F.3d 524, 528 (4th Cir. 2000) (holding that frisk during consensual encounter in which suspect refused to answer officer's questions or to comply with police request to remove hand from pocket was illegal because officer who thinks suspect might be armed "must [also] have reasonable suspicion supported by articulable facts that criminal activity may be afoot" in order to justify weapons frisk).

Reasonable suspicion is "something more than an 'inchoate and unparticularized suspicion or "hunch."'" Sokolow, 490 U.S. at 7, 109 S. Ct. at 1585 (quoting Terry, 392 U.S. at 27, 88 S. Ct. at 1883). "[I]t is the government's burden to articulate facts sufficient to support reasonable suspicion" under a totality-of-the-circumstances test. Burton, 228 F.3d at 527-28. Circumstances "relevant in [this] analysis include characteristics of the area surrounding the stop, the time of the stop, the specific conduct of the suspect individual, the character of the offense under suspicion, and the unique perspective of a police officer trained and experienced in the detection of crime." Christian v. Commonwealth, 33 Va. App. 704, 714, 536 S.E.2d 477, 482 (2000) (*en banc*) (footnote omitted). "Although the nature of the totality of the circumstances test makes it possible for individually innocuous factors to add up to reasonable suspicion, it is 'impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.'" United States v. Wood, 106 F.3d 942, 948 (10th Cir. 1997) (quoting Karnes v. Skrutski, 62 F.3d 485, 496 (3d Cir. 1995)).

> [I]t is for the police to articulate the facts and what their experience reveals as to those facts. Such generalities as "he didn't look right" will not suffice; like Officer McFadden in Terry, the officer must relate what he has observed, and, when appropriate, indicate

- 12 -

> why his knowledge of the crime problem and the habits of the residents on his beat or of the practices of those planning or engaging in certain forms of criminal conduct gives special significance to what he observed.

4 LaFave, supra, § 9.4(a), at 141-42 (footnote omitted) (citing United States v. Cortez, 449 U.S. 411, 417-18, 101 S. Ct. 690, 695, 697, 66 L. Ed. 2d 621 (1981) (observing border patrol agents explained "inferences and deductions [they properly made] that might well [have] elude[d] an untrained person" such that "a particularized and objective basis" for the Terry stop was established); People v. LoCicero, 556 N.W.2d 498, 502 (Mich. 1996) (holding reasonable suspicion not established by "the bald assertion by an officer that the situation looked like a drug transaction" because he "did not explain how his previous training and experience led to this conclusion")).

When a police officer lacks the reasonable articulable suspicion necessary to detain an individual, that individual has a "right to go about his business or to stay put and remain silent in the face of police questioning." Illinois v. Wardlow, 528 U.S. 119, 125, 120 S. Ct. 673, 676, 145 L. Ed. 2d 570 (2000). An individual's "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for detention or seizure." Florida v. Bostick, 501 U.S. 429, 437, 111 S. Ct. 2382, 2387, 115 L. Ed. 2d 389 (1991); see also United States v. Flowers, 912 F.2d 707, 712 (4th Cir. 1990) (noting that a defendant has "the right to refuse to speak with . . . officers, who in turn possess no right to detain citizens who decline to talk or otherwise identify themselves").

Here, I would hold the evidence was insufficient to provide Officer Davenport with reasonable suspicion to believe that appellant was engaged in criminal activity and, additionally, that he was armed and dangerous. Although the area was known as an open-air drug market, the encounter occurred in broad daylight. The officers had not received a tip of any sort involving appellant or the driver or any other occupant of the car in which appellant was riding. The

officers first noticed the car when it slowly circled the block in this high-crime neighborhood and pulled over once briefly before pulling back into traffic and pulling around the next corner before parking on the side of the street.[4] Officer Davenport thought this driving warranted further observation of the vehicle and had a hunch that its occupants might be involved in criminal activity. However, driving in this manner in a high-crime area, standing alone, was insufficient to provide reasonable suspicion for a Terry stop, and Officer Davenport made no claim to the contrary. Compare Terry, 392 U.S. at 6, 22-23, 88 S. Ct. at 1872, 1880-81 (holding officer who believed two men were "'casing a job, a stick-up'" and might have a gun had reasonable suspicion to believe criminal activity might be afoot after, *inter alia*, watching Terry and his companion walk separately past a store window and back, peer inside while passing, make such trips "five or six times apiece" over a period of ten to twelve minutes, and confer with each other on the corner between trips), and State v. Gopher, 631 P.2d 293, 294 (Mont. 1981) (holding slow driving can be a factor which, with other information, is sufficient to establish reasonable suspicion, such as where vehicle was seen driving slowly past scene of suspected burglary, exhibiting "'an unusual curiosity'" in the crime site, *and* officer specifically articulated, based on his experience, that it was not uncommon for burglars to return to the scene of a crime after first breaking a window to see if the burglary was likely to be discovered), with State v. Gilder, 985 P.2d 147, 149 (Mont. 1999) (holding only evidence presented "was that Gilder was 'driving okay except . . . slowly,' and that he made a right turn, then a left turn, then another left turn, then

---

[4] Officer Davenport testified that "[w]e started making a very slow circle of this one block" on 28th and 29th Streets, and "[w]e made it probably *one* time" "around the block." (Emphasis added). The vehicle in which appellant was riding started on 29th Street, "pulled over" "at the initial, the first right turn," "entered back into the lane of travel and then circled here, and then made almost *one* complete circle" before "pull[ing] over again." (Emphasis added). Thus, contrary to the majority's view that the vehicle circled the block twice, I believe the only fair reading of the evidence, viewed in the light most favorable to the Commonwealth, is that the vehicle circled the block only once.

- 14 -

another right turn, before [the deputy] initiated the stop" and that "[t]hese facts alone do not demonstrate sufficient objective data from which an experienced officer can make inferences of criminal wrongdoing"). Davenport did not see appellant or any other occupant of the car engage in any furtive movements, hand gestures or other motions that might indicate the buying, selling, possessing or hiding of drugs or any other crime. When appellant exited the vehicle, he made no effort to avoid Officer Davenport and, in fact, walked in the direction of the marked police vehicle.

I recognize Officer Davenport did not violate the Fourth Amendment by attempting to engage appellant in a consensual encounter, but I would hold the circumstances of that encounter were insufficient to elevate Davenport's inchoate hunch that appellant might be engaged in criminal activity into the reasonable suspicion required for a Terry stop. Although appellant initially agreed to the encounter, it occurred on a public street, and appellant was under no obligation to give Officer Davenport his correct name or birth date or any name or birth date at all. Assuming without deciding that appellant's extreme nervousness, coupled with the bulge in his coat pocket, might have been sufficient to give Officer Davenport reasonable suspicion to believe appellant might be armed, it did not provide reasonable suspicion to believe appellant was engaged in criminal activity, which was a prerequisite to Davenport's frisk of appellant for weapons. Compare Burton, 228 F.3d at 528-29 (where officer encountered individual at telephone booth with hand in pocket and individual "refuse[d] to talk with the policemen and to remove his hand from his pocket," evidence was insufficient to establish reasonable suspicion for detention and frisk "merely because [officer felt] uneasy about his safety"), with United States v. Mayo, 361 F.3d 802, 803, 805-08 (4th Cir. 2004) (where (1) officers encountered individual in high crime area; (2) individual immediately put hand in pocket, which appeared heavy, engaged in physically evasive and "unusually nervous behavior" "when the officers confronted [him]";

- 15 -

and (3) "officers . . . asserted that they had reasonable suspicion supported by articulable facts that Mayo was possessing a concealed weapon" in violation of Virginia law making it unlawful to carry a concealed weapon without a permit, holding evidence was sufficient as a matter of law to establish reasonable suspicion both that criminal activity was afoot and that individual was armed and dangerous and distinguishing Burton on ground that officers in Burton "conceded that they had no 'indication that [the defendant] was at the time engaging in any illegal activity'").

Officer Davenport implicitly conceded his own belief that he lacked reasonable suspicion for the detention, indicating that he considered appellant "free to leave" even after he conducted the initial weapons frisk and determined that the bulge in appellant's pocket was a soda can rather than a weapon. Davenport said appellant's custodial status changed only after Davenport felt the syringe in appellant's pocket and appellant admitted he was not a diabetic. Although Officer Davenport's subjective beliefs are not controlling, see Whren v. United States, 517 U.S. 806, 812-13, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89 (1996), the Commonwealth bore the burden of articulating and proving the existence of reasonable suspicion under the facts as viewed by a reasonable police officer, and I agree with Officer Davenport's assessment that he lacked the necessary reasonable suspicion under the facts of this case. Appellant's actions in a high-crime neighborhood were suspicious, but they did not provide reasonable suspicion to believe appellant was engaged in criminal activity, even when accompanied by appellant's having likely given Officer Davenport an incorrect name, age or birth date and incorrect information about why he was in the area. Appellant was on a public street and had not been observed engaging in any behavior providing reasonable suspicion to believe he was involved in criminal activity, and, thus, he was under no duty either to answer Officer Davenport's questions or to give correct answers to those questions. Appellant's statement that he was in the neighborhood to visit someone at a particular house, even if incorrect or intentionally false, was

- 16 -

insufficient to provide Officer Davenport with reasonable suspicion to believe he was present to engage in a narcotics transaction or some other criminal activity. "In the absence of reasonable suspicion, [Officer Davenport's] alternative was 'to avoid a person he considers dangerous.'" Burton, 228 F.3d at 528 (quoting Terry, 392 U.S. at 32, 88 S. Ct. at 1886 (Harlan, J., concurring)).

For these reasons, I would hold the frisk violated the Fourth Amendment. Because I believe Officer Davenport found the cocaine in a search incident to appellant's arrest for possession of items the officer found during the illegal frisk, I would hold the discovery of the cocaine was tainted by the illegal frisk and should have been suppressed. See Wong Sun v. United States, 371 U.S. 471, 484-86, 83 S. Ct. 407, 415-17, 9 L. Ed. 2d 441 (1963). Thus, I respectfully dissent.