COURT OF APPEALS OF VIRGINIA

Present:    Judges Humphreys, Clements and Haley
Argued at Chesapeake, Virginia


DEMETRES JERROD RUDOLPH
                                                    MEMORANDUM OPINION* BY
v.        Record No. 0240-07-1                      JUDGE ROBERT J. HUMPHREYS
                                                    FEBRUARY 26, 2008
COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
                              A. Bonwill Shockley, Judge

            Melinda R. Glaubke (Slipow, Robusto & Kellam, P.C., on brief), for
            appellant.

            Josephine F. Whalen, Assistant Attorney General II (Robert F.
            McDonnell, Attorney General, on brief), for appellee.


        Demetres J. Rudolph ("Rudolph") appeals his conviction, following his conditional guilty

plea, for possession of marijuana with intent to distribute, in violation of Code § 18.2-248.1.

Rudolph argues that the trial court erred by not suppressing marijuana found in his vehicle.

Rudolph claims that the stop of his vehicle that resulted in the discovery of the marijuana

violated the Fourth Amendment to the United States Constitution because the stop was not based

on reasonable suspicion.  We disagree and affirm the decision of the trial court.

                                        ANALYSIS

        The sole issue on appeal is whether Officer Jeremy Latchman's stop of Rudolph's vehicle

was permissible under the Fourth Amendment.  The permissibility of a traffic stop under the

Fourth Amendment is "a mixed question of law and fact."  Ornelas v. United States, 517 U.S.

690, 696 (1996).  Accordingly, "we are bound by the trial court's findings of historical fact

_____

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

unless 'plainly wrong' or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (*en banc*). However, we review the trial court's application of the Fourth Amendment to those facts *de novo*. See Ornelas, 517 U.S. at 691.

The Fourth Amendment "does not proscribe all searches and seizures, but only those that are unreasonable." Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 619 (1989). In Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court of the United States "held that an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). "Reasonable, articulable suspicion" requires more than an officer's "inchoate and unparticularized suspicion or 'hunch.'" Terry, 392 U.S. at 17. However, it requires "considerably less than proof of wrongdoing by a preponderance of the evidence" and "obviously less" than probable cause. United States v. Sokolow, 490 U.S. 1, 7 (1989). To justify a Terry stop, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21.

"It is well established that whether reasonable suspicion 'exists to warrant an investigatory stop is determined by the totality of the circumstances.'" Gregory v. Commonwealth, 22 Va. App. 100, 107, 468 S.E.2d 117, 121 (1996) (quoting Smith v. Commonwealth, 12 Va. App. 1100, 1103, 407 S.E.2d 49, 51 (1991)). Some of the circumstances this Court has considered include "an obvious attempt to avoid officers,'" Williams v. Commonwealth, 4 Va. App. 53, 67, 354 S.E.2d 79, 87 (1987), the "defendant's presence in a high crime area," Brown v. Commonwealth, 15 Va. App. 232, 235 n.1, 421 S.E.2d 911, 912 n.1

- 2 -

(1992), and any "furtive movements and suspicious conduct" of the defendant, Purdie v.

Commonwealth, 36 Va. App. 178, 186, 549 S.E.2d 33, 37 (2001).

On the night in question, Officer Latchman was patrolling at a shopping center because

the police department "had beefed up a lot of extra patrol and a lot of overtime due to the fact

that there w[ere] a lot of break-ins and robberies in that specific shopping center." A gas station

was located in the parking lot of that shopping center. Officer Latchman saw Rudolph and

another man in "a vehicle with no lights on parked parallel in the rear" of the gas station.[1]

Officer Latchman found it "unusual" that Rudolph was parked behind the building because,

although there is a rear entrance, "[t]he front of the building is where all the customers come in"

and "no one enters [the rear entrance] at nighttime."[2] Officer Latchman also noted that, although

there were marked parking spots near Rudolph's car, he was not parked in any of them.

Driving his marked police vehicle, Officer Latchman stopped approximately one to

one-and-one-half car lengths behind Rudolph and watched the vehicle for several seconds. As

he watched the car, he saw both passengers making "furtive movements." The two men "bent

down a couple of times" and it "looked like they were reaching for stuff." Officer Latchman

decided to drive around the gas station to "make sure everything was fine." As Officer

Latchman proceeded around the building, Rudolph pulled away from the curb and began to

leave.

---

[1] Due to the layout of the gas station and the parking lot, it is difficult to say whether
Rudolph was parked in the rear of the building or along its side. However, whether he was
parked on the side or in the rear does not affect our analysis. It is sufficient for us to say that
Rudolph was parked on the side of the building that is opposite the gas pumps and the main
entrance to the gas station.

[2] Although Officer Latchman later learned that the rear entrance is locked at night, he
testified that it was "unusual" for someone to use the rear entrance at night based on his own
experience of "observing gas stations." He explained that it was his experience that "[t]he
customers go through the front door, not through the back."

Rudolph argues and the dissent agrees that those circumstances are not sufficient to create reasonable suspicion. We disagree. Several of the circumstances that Officer Latchman articulated point to the reasonable inference that the vehicle's occupants were preparing to rob the gas station. The gas station was in the parking lot of a shopping center that had recently been subject to several burglaries and robberies.[3] Rudolph was parked in a dark, low-traffic area in a manner well-suited for a quick getaway. He and the passenger were bending over and reaching around the floorboard, but did not turn on the vehicle's interior lights. When Rudolph saw Officer Latchman's patrol car pull past him, he promptly attempted to drive away.

Based on all of those circumstances, the trial court did not err in finding that it was reasonable to suspect "that criminal activity may be afoot." Terry, 392 U.S. at 17. Officer Latchman had been assigned to that shopping center specifically because of recent and repeated occurrences of a crime, the imminent commission of which was consistent with Officer Latchman's observations. Reasonable suspicion sufficient to allow a police officer to investigate does not arise only after the commission of a crime. Harmon v. Commonwealth, 15 Va. App. 440, 444, 425 S.E.2d 77, 79 (1992) ("Actual proof that criminal activity *is* afoot is not necessary; the record need only show that it *may* be afoot." (emphasis in original)). To require a level of

---

[3] Contrary to the dissent's assertions, we make no claim that the gas station was located in a general "high crime" area. There is no evidence in the record that overall criminal activity is higher in this neighborhood than in other parts of Virginia Beach. Rather, as part of a reasonable suspicion analysis, we merely acknowledge Officer Latchman's testimony that the police department "had beefed up a lot of extra patrol and a lot of overtime due to the fact that there w[ere] a lot of break-ins and robberies in that specific shopping center." We disagree with the dissent that the recent history of burglaries and robberies in that location has only "marginal significance" in the investigation of crime in the area. By way of analogy, the fact that people have attempted to smuggle dangerous items onto airplanes has certainly more than "marginal significance" in an analysis of whether it is reasonable for agents of the federal government to search the carry-on luggage of airline passengers before they board a plane. The fact that Officer Latchman observed actions consistent with the preparation for a robbery when coupled with the fact that several robberies had recently occurred in that specific location is most certainly significant to any reasonable suspicion analysis.

suspicion greater than that present in this case would be to effectively replace the requirement of reasonable suspicion with the higher standard of probable cause.

We disagree with the dissent's view that a finding of reasonable suspicion in this case is inconsistent with the holding of our Supreme Court in Ewell v. Commonwealth, 254 Va. 214, 491 S.E.2d 721 (1997). The circumstances that Officer Latchman observed in this case are significantly more suspicious than the circumstances of Ewell. In Ewell, the only "suspicious" facts were that the suspect was parked late at night in an apartment complex "suspected of 'high narcotics' trafficking," the officer did not recognize the driver or the vehicle, and the vehicle attempted to leave upon the officer's arrival. Id. at 216, 491 S.E.2d at 722. The officer in Ewell did not observe any additional actions consistent with the trafficking of drugs. In fact, the Court specifically noted, "Although the automobile was parked in an area suspected of 'high narcotics' trafficking and it exited the parking lot upon [the officer's] arrival in a police vehicle, nothing about Ewell's conduct was suspicious." Id. at 217, 491 S.E.2d at 723.

The facts in this case are quite different. Here, as in Ewell, the officer observed the suspect parked at night in a high crime area and the suspect attempted to leave the parking lot shortly after the arrival of the police vehicle. However, the officer in this case, unlike the officer in Ewell, also observed several facts consistent with, and preparatory to, the very type of crime that had recently been occurring in that shopping center and which he had been assigned to prevent. Considering the specific recent history of robberies and burglaries and Rudolph's conduct consistent with that of a person preparing to commit that specific crime, the facts before us today are clearly more suspicious than the facts of Ewell. Thus, we reject the dissent's assertion that our decision today is inconsistent with Ewell.

The dissent also cites our recent case, Asble v. Commonwealth, 50 Va. App. 643, 653 S.E.2d 285 (2007), as proof that Rudolph's movements inside his vehicle did not create

- 5 -

reasonable suspicion. We agree that Rudolph's movements inside his vehicle did not in and of themselves give rise to reasonable suspicion. Rather, his movements were simply one of several factors that created reasonable suspicion. Asble is factually distinct from this case and does not dictate that the act of repeatedly bending down and reaching around the floorboard of a car cannot be considered as one factor among many that may together constitute reasonable suspicion. In Asble, reasonable suspicion did not exist because, unlike in this case, a furtive movement by a passenger of a parked car was the *only* suspicious circumstance the investigating officer could articulate. In Asble, a police officer observed a vehicle parked on the shoulder of an entrance ramp of a highway late at night. As he approached the vehicle the officer observed the driver "bend toward the floorboard, making a motion with his arm." Id. at 646, 653 S.E.2d at 286. When the officer arrived at the vehicle he saw a woman lying across the back seat and "'asked were they okay.'" Id. The driver told the officer that the woman was his wife and that she was sick. Without asking any further questions, the officer asked the driver to get out of the car and initiated a Terry stop. We held that the officer did not have reasonable suspicion because, under the circumstances, the driver's act of bending over and reaching around did not create reasonable suspicion by itself. However, nothing in Asble mandates that it is improper to consider bending down and reaching around the floorboard of a car as one of many factors in a reasonable suspicion analysis as we do here.[4]

_____

[4] The dissent also cites Asble in raising a concern that Officer Latchman did not identify the particular offense that he suspected Rudolph of committing. That concern is, however, without basis.

> "It is important to remember that we are not limited to what the stopping officer says or to evidence of his subjective rationale; rather, we look to the record as a whole to determine what facts were known to the officer and then consider whether a reasonable officer in those circumstances would have been suspicious."

The dissent's essential argument is that, because no one particular circumstance of this case gives rise to reasonable suspicion, reasonable suspicion must not exist. The flaw in that reasoning is that it analyzes each circumstance in isolation instead of viewing all of the circumstances together. Both the United States Supreme Court and the Virginia Supreme Court have continuously recognized that the determination of reasonable suspicion is based on the totality of the circumstances available to the officer. See United States v. Arvizu, 534 U.S. 266, 273 (2002) ("When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."); Whitfield v. Commonwealth, 265 Va. 358, 361, 576 S.E.2d 463, 465 (2003) ("To determine whether a police officer had a particularized and objective basis for suspecting that the person stopped may be involved in criminal activity, a court must consider the totality of the circumstances."). "Under the Fourth Amendment, 'the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts.'" Raab v. Commonwealth, 49 Va. App. 638, 644-45, 644 S.E.2d 78, 81-82 (2007). Terry itself recognized that each individual action that contributes to reasonable suspicion may be "innocent in itself," but "taken together" the circumstances may "warrant further investigation." Terry, 392 U.S. at 23. Put another way, Terry and its progeny

---

Raab v. Commonwealth, 49 Va. App. 638, 642 n.4, 644 S.E.2d 78, 82 n.4 (2007) quoting United States v. Brown, 232 F.3d 589, 594 (7th Cir. 2000)). "The validity of a seizure 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's actual state of mind at the time the challenged action was taken.'" Welshman v. Commonwealth, 28 Va. App. 20, 30, 502 S.E.2d 122, 137 (1998) (*en banc*) (quoting Maryland v. Macon, 472 U.S. 463, 470-71 (1985)). "The fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." Whren v. United States, 517 U.S. 806, 813 (1996).

recognize that the question is not whether there might be an innocent explanation for the facts and circumstances that give rise to an officer's suspicion of criminal activity as the dissent seems to suggest, but rather whether the facts and circumstances are such that it is reasonable for the officer to investigate further to determine whether that is indeed the case. See Arvizu, 534 U.S. at 277 ("A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct."); Raab, 49 Va. App. at 643, 644 S.E.2d at 81 ("The possibility – even a more-likely-than-not probability – of an innocent explanation for the conduct does not necessarily forbid an officer from making a brief, investigatory stop."). The dissent goes to great lengths to single out individual circumstances and point out that, standing alone, none of them give rise to reasonable suspicion. That, however, is not the issue. The question we must answer is whether, under the *totality of the circumstances*, Officer Latchman had reasonable suspicion to believe that criminal activity was afoot. We hold that he did.

CONCLUSION

Viewing all of the facts available to Officer Latchman – the time of day, the location of Rudolph's vehicle in relation to the gas station, the recent history of burglaries and robberies at that location, Rudolph's movements in the vehicle, and Rudolph's attempt to leave after a marked police vehicle pulled out from behind him – it is clear that he had reasonable suspicion to believe that "criminal activity might be afoot." Terry, 392 U.S. at 30. Thus, Officer Latchman's stop of Rudolph's vehicle to investigate further did not violate the Fourth Amendment. We therefore affirm the decision of the trial court.

Affirmed.

- 8 -

Haley, J., dissenting.

Today the majority holds that the Fourth Amendment permits the police to detain persons who reach for things inside their automobiles, while parked near the entrance to an open business, provided they do so in a "high crime" neighborhood and drive away shortly after they are seen by the police. I dissent because I think this conclusion is inconsistent with the Fourth Amendment.

FACTS

Appellant's vehicle was parked next to the Citgo gas station and convenience store in the shopping center with its headlights off. Officer Latchman described the location of appellant's vehicle as "in the rear of" the Citgo station, and it is true that the car was parked on the side of the station opposite the gasoline pumps. Yet, during his testimony at the suppression hearing, Officer Latchman marked photographs of the exterior of the gas station at the spot on the photograph where he first saw appellant's parked car. The marks on these photographs demonstrate that appellant's car was parked only a few steps away from one of the doorways into the station. A speed bump is visible in one of the photos immediately in the path of appellant's car. The majority mentions, in its analysis, the officer's testimony that it would have been unusual for a customer not to use the other door next to the gasoline pumps. On this point, the majority ignores the following testimony:

> A: Yes sir. In the back of the building, no one enters at nighttime. The front of the building is where all the customers come in. So it would have been unusual for the vehicle to be parked there. Based on those circumstances, that's why I stopped the vehicle.
>
> Q: And that's the only other question I had. The back door, is that open at night?
>
> A: No.
>
> Q: Just the front area by the pumps?
>
> A: Yes. Because there was only one clerk in there at the time.

* * * * * * *

RECROSS-EXAMINATION

Q: How do you know that?

A: I can tell you from – from both – both of us speaking to the clerk.

Q: Okay. But this was after this arrest?

A: Well, it was while the whole investigation was going on.

Q: Okay. You did not have that information prior to making the stop? You learned afterwards that by asking the clerk was the door locked? You learned that after the investigation?

A: Right.

The photographs also display advertisements for cigarettes in the exterior windows of the Citgo station, adjacent to the door where appellant had stopped, signifying their availability for sale to customers who might come through the door. Officer Latchman testified that the station was still open for business when he saw appellant's vehicle. He also testified that he was on patrol because there had been a number of burglaries and robberies in the shopping center. However, he was not investigating any specific crime. Nor had anyone from the Citgo station called the police to report any suspicious behavior by appellant or by anyone else. Officer Latchman was driving his marked police vehicle through the gas station parking lot. He recounts what happened next.

Q: While you were observing the defendant sitting in the vehicle there at the rear, did you notice anything about his demeanor or actions?

A: While I was sitting directly behind the vehicle, I observed the defendant. He appeared to be moving around in the vehicle. His head went down a couple of times and back up. I don't know if he was looking around for something or what else was going on in the vehicle at the time.

Q: You said while you were sitting behind him. How close were you sitting behind him?

A: Probably, I would say, about a car length or a car length and a half.

        *      *      *      *      *      *      *

Q: Okay. And how long did you sit there behind him?

A: Just for a few seconds.

Q: What did you do next after sitting there observing his movements?

A: I decided to go around the vehicle and make sure everything was fine, just take a look inside the building as I drove by and make sure everything was fine. When I came around the front, I observed the vehicle start moving away.

Q: Okay. What did you do upon observing that?

A: Upon observing him parked, before he left the lot, I pulled up behind him and initiated the investigation on the vehicle and what was going on back at the end of the building.

Officer Latchman activated his emergency equipment and stopped appellant's car. There was no evidence that appellant had seen Officer Latchman before the officer initiated the stop.

ANALYSIS

The majority begins its analysis by correctly identifying our standard of review, and quoting the well-settled proposition that police may briefly stop and detain persons if, based on the totality of the circumstances, they have a reasonable, articulable suspicion of criminal activity. Terry v. Ohio, 392 U.S. 1, 17 (1968). Next they cite cases identifying some factors that are sometimes relevant to the reasonable suspicion analysis. At this point in the opinion, the majority mentions three factors: attempting to avoid officers, presence in a "high crime area," and the more generic "furtive movements and suspicious conduct."

I conclude that the cases from which the majority collects these factors are substantially distinguishable from this case. Thus, the majority's reliance upon them is unpersuasive. For

- 11 -

example, Brown v. Commonwealth, 15 Va. App. 232, 421 S.E.2d 911 (1992), is not even a Fourth Amendment case. It addresses instead the circumstances under which a police officer's testimony about the reputation of a neighborhood for illegal drug trafficking can be admissible evidence in a jury trial for drug possession with the intent to distribute. Id. at 234, 421 S.E.2d at 912. The subject of investigative stops is mentioned only in the footnote cited by the majority, very briefly, and only to point out that, "the defendant's presence in a high crime area, standing alone, does not provide the requisite degree of suspicion to justify an investigatory stop." Id. at 234 n.1, 421 S.E.2d at 912 n.1. The decision is not very instructive as to whether and, if so, why and to what extent the "high crime" neighborhood around the Citgo station was relevant to Officer Latchman's stop of appellant under the totality of the circumstances in our case.

Purdie v. Commonwealth, 36 Va. App. 178, 549 S.E.2d 33 (2001), also cited in the majority opinion, is not a vehicle stop case either. "Purdie does not challenge the stop of the vehicle in which he was a passenger, the request for him to exit the vehicle, or the initial patdown conducted by Officer Conigliaro." Id. at 185, 549 S.E.2d at 36. Instead, the Purdie decision decided that the police had probable cause to search the defendant's pocket. Id. at 186, 549 S.E.2d at 37. The defendant was known to the police for having previously stabbed an officer and for having previously thrown away narcotics while attempting to flee the police. Id. at 182, 549 S.E.2d at 35. After the stop, the defendant appeared to be nervous; he walked with a hunched posture that obscured the view of his waistband/groin area when the officers were in front of him and resumed a normal posture when his back was to the officers. He repeatedly pushed his hands into his pockets and brought them out of his pockets again with his fists clenched around something while looking 360 degrees around him, and he finally swallowed something concealed in his hand when subjected to a pat down by police. Id. at 183-84, 549 S.E.2d at 36. It is helpful to read the language from the majority's quotation in its full context:

"Based upon the totality of the circumstances, consisting of furtive movements and suspicious conduct, which culminated in Purdie swallowing something that had been hidden in his hand, [the officer] had probable cause to believe that Purdie had disposed of an illegal substance." Id. at 186, 549 S.E.2d at 37. There is nothing in the record before us demonstrating "furtive movements and evasive behavior" remotely approaching the circumstances of suspicion in Purdie.

Williams v. Commonwealth, 4 Va. App. 53, 58-59, 354 S.E.2d 79, 82 (1987), addresses, among other issues, the stop of a motorist who had been accused of cocaine distribution by two confidential police informants, informants who identified the motorist's alleged accomplice and cocaine supplier, described the make and model year of the motorist's car, described the way he allegedly received the cocaine, and identified the specific address from which he allegedly sold the cocaine. A detective also conducted a record check and learned that this particular motorist had a drug-related criminal history in South Carolina, which, according to the confidential informants, was the very place from which the defendant's drug supplier mailed him the drugs. Id. The police stopped the defendant when they saw him driving away from his house at the same time other police were on the way to that house to serve a search warrant issued by a neutral magistrate upon an affidavit which included the details provided by the confidential informants and the results of the criminal record check. Id. at 59, 354 S.E.2d at 82.

This Court's decision in Williams held that the police had a reasonable suspicion to stop the defendant's vehicle. Id. at 65, 354 S.E.2d at 85-86. The paragraph in the Williams opinion analyzing the vehicle stop is devoted entirely to the circumstances focusing suspicion on the individual motorist: the information provided by the confidential informants, the record check, and the search warrant. Id. The paragraph does not even mention the defendant's driving away

from the house.  Id.  I do not believe Williams provides any meaningful support for Officer Latchman's stop of appellant.

APPELLANT'S "FURTIVE MOVEMENTS"

The majority mentions  appellant's movements in their decision to affirm the trial court. I believe this decision is inconsistent with our recent decision in Asble v. Commonwealth, 50 Va. App. 643, 653 S.E.2d 285 (2007).  Asble is instructive on the issue of whether appellant's "furtive movements" justified the seizure in this case.  In Asble, a police officer saw the defendant and a passenger inside a nonmoving car, shortly before midnight, on the shoulder lane of an entrance ramp onto Interstate 264.  The police officer testified that, as he approached the car, he saw the defendant bend toward the floorboard and move his arm.  Id. at 646, 653 S.E.2d at 286.  The officer asked the defendant what he was doing on the shoulder of the entrance ramp, and the defendant replied that his wife was sick.  Id. at 646-67, 653 S.E.2d at 286.  The officer then removed the defendant from the car and frisked him for weapons.  Id. at 647, 653 S.E.2d at 286.  We held that the trial court erred in failing to grant the defendant's motion to suppress evidence recovered as a result of the stop because the officer did not have a reasonable suspicion that the defendant was engaged in criminal activity.  Id. at 649, 653 S.E.2d at 287-88.  Asble assists our analysis of this case because that decision analyzed the defendant's "furtive gesture" toward the floorboard and concluded that it did not create a reasonable suspicion of criminal activity.  Id. at 649, 653 S.E.2d at 288.  "[The officer] noted only that 'sometimes' when movement such as he saw occurs, weapons and/or narcotics are present.  This was, at best, a mere hunch, not a particularized suspicion flowing reasonably from articulable facts."  Id.

I do not believe the majority's attempt to distinguish Asble is persuasive.  They merely follow a summary of the facts with this statement:  "[N]othing in Asble mandates that it is improper to consider bending down and reaching around the floorboard of a car as one of many

factors in the reasonable suspicion analysis." This is true enough, but not very helpful. It does not explain why this Court should allow the stop in this case when we found the stop in <u>Asble</u> to violate the Constitution. Both stops came after "furtive movements," late at night, by a person who was in a parked car with a passenger. What additional factor makes this case so meaningfully different that we should reach the opposite result? The majority's determination that the stop in this case was justified suggests that they find the defendant's presence in a "high crime" area to be the decisive factor.

THE SIGNIFICANCE OF A HIGH CRIME AREA

Accordingly, I shall analyze under what circumstances can a person's presence in a "high crime" area ever reasonably heighten the circumstances of suspicion surrounding a particular individual. This is an important question because, though they do not say so explicitly, the majority's position suggests that they believe that the stop in <u>Asble</u> would pass constitutional muster if it had taken place in the parking lot of the Citgo station. In deciding this question, our guide must be the principles laid down in prior cases and a careful recognition of how such cases have applied the defendant's presence in a "high crime area" to the reasonable suspicion analysis. It is a good start to remember that, except for certain checkpoint and roadblock cases not applicable here, the reasonableness of a Fourth Amendment seizure depends upon circumstances tending to focus suspicion on the specific individual seized. <u>Delaware v. Prouse</u>, 440 U.S. 648, 663 (1979); <u>Leeth v. Commonwealth</u>, 223 Va. 335, 340, 288 S.E.2d 475, 478 (1982) (citing <u>United States v. Cortez</u>, 449 U.S. 411, 417-18 (1981)); <u>Giles v. Commonwealth</u>, 32 Va. App. 519, 523, 529 S.E.2d 327, 329 (2000) (citing <u>Jacques v. Commonwealth</u>, 12 Va. App. 591, 593, 405 S.E.2d 630, 631 (1991)).

There is an undeniable tension between the public character of a neighborhood's reputation for criminal activity and a legal standard that requires "a particularized and objective

basis for suspecting the particular person stopped of criminal activity." Riley v. Commonwealth, 13 Va. App. 494, 498, 412 S.E.2d 724, 727 (1992) (quoting Cortez, 449 U.S. at 417). Perhaps this is the reason, in an area of the law featuring very few bright-line rules, and dominated by a case-by-case, totality of the circumstances approach, a person's presence in a "high crime" area is one of the few factors that can never, by itself, be decisive. Brown v. Texas, 443 U.S. 47, 52 (1979); Goodwin v. Commonwealth, 11 Va. App. 363, 398 S.E.2d 690 (1990).

> "[T]housands of citizens live and go about their legitimate day to-day activities in areas which surface . . . in court testimony, as being high crime neighborhoods. The fact that the events here at issue took place at or near an allegedly 'high narcotics activity' area does not objectively lend any sinister connotation to facts that are innocent on their face."

Riley, 13 Va. App. at 498, 412 S.E.2d at 726-27 (quoting Smith v. United States, 558 A.2d 312, 316 (D.C. App. 1989)). "Even in high crime areas, where the possibility that any given individual is armed is significant, Terry requires reasonable, individualized suspicion before a frisk for weapons can be conducted." Maryland v. Buie, 494 U.S. 325, 334 n.2 (1990).

While the phrase "high crime area" appears frequently in Virginia decisions, it is rarely discussed at length. Nor do the cases that do mention it explain when, if ever, the defendant's presence in a high crime area makes the difference between circumstances where a seizure would be unreasonable and circumstances justifying a Terry stop. This Court has, however, considered the criminal reputation of the area in upholding a Terry stop of a man standing, at night, in an area with a reputation for drug activity, who made eye contact with a passing police officer, and then attempted to shove something into the pocket of the person next to him, who refused to accept whatever it was. Walker v. Commonwealth, 42 Va. App. 782, 595 S.E.2d 30 (2004). We also mentioned this factor in deciding that a police officer had reasonable suspicion to stop a man the officer saw handing items, which the officer could not see, to a few different women, after two o'clock in the morning, outside an apartment building in a "high-crime area"; another police

officer also noticed that the man handed a large wad of money to another man who went into the apartment building; both officers had heard shooting in the area and noticed empty shell casings on the ground near the man. Kidd v. Commonwealth, 38 Va. App. 433, 565 S.E.2d 337 (2002).

It is also important to consider our precedents reversing fruits of unlawful Terry stops, despite police testimony that the defendant was present in a "high crime" area. One of these cases is Ewell v. Commonwealth, 254 Va. 214, 491 S.E.2d 721 (1997), which the majority attempts to distinguish from this case. In Ewell, a police officer noticed the defendant in the parking lot of an apartment complex shortly after midnight. Id. at 216, 491 S.E.2d at 722. The officer testified that he knew the apartment complex as an area of frequent narcotics trafficking and that he did not recognize the defendant, even though he knew most of the people who lived in the apartments. Id. There was also a lighted sign in the parking lot which read: "no trespassing." Id. The police officer also testified that the defendant attempted to leave the parking lot in her car as soon as the police vehicle came into the lot. Id. Our Supreme Court ruled that the officer's stop of the defendant's car as she drove away was not supported by a reasonable suspicion of criminal activity. "Although the automobile was parked in an area suspected of 'high narcotics' trafficking and it exited the parking lot upon [the officer's] arrival in a police vehicle, nothing about Ewell's conduct was suspicious." Id. at 217, 491 S.E.2d at 723.

We also reversed the defendant's conviction in Goodwin, 11 Va. App. at 367, 398 S.E.2d at 692. In Goodwin, the police saw the defendant in a "high crime" area walk out from behind some apartments and toward the street; when the defendant appeared to see the police car, he "jammed" his hand into his coat pocket. Id. at 365, 398 S.E.2d at 691. Despite not having seen what the defendant had in his hand, the police officer approached him and told them he wanted

to pat him down for weapons.  Id.  We held that the police lacked reasonable suspicion to make the stop.  Id. at 367, 398 S.E.2d at 692.

In Riley, 13 Va. App. at 495, 412 S.E.2d at 725, the police observed the defendant exit a vehicle in a "high crime" area.  After exiting the vehicle, the defendant turned his back to the police and made a motion toward his waistband.  Id.  The police officer testified that, though he did not see any object, he believed the defendant had a weapon.  Id.  We held the stop of the defendant violated the Fourth Amendment and reversed his conviction.  "[The police officer] had no prior knowledge of Riley or his possible involvement in any criminal activity."  Id. at 497, 412 S.E.2d at 726.  We also held that a police officer had no reasonable suspicion to stop a person in a playground described as a high crime area when the police officer saw the man quickly thrust his hand into his pants when the officer approached in his car.  Smith v. Commonwealth, 12 Va. App. 1100, 1104, 407 S.E.2d 49, 52 (1991).

Christian v. Commonwealth, 33 Va. App. 704, 536 S.E.2d 477 (2000), may be the decision of this Court that comes closest to suggesting that the criminal reputation of the area might have been decisive in the decision to uphold a Terry stop of an individual.  Two undercover police officers were selling imitation controlled substances to people who walked by or drove through an apartment complex where there had been many complaints of drug sales.  Id. at 707, 536 S.E.2d at 479.  The police officer assigned to protect the undercover officers noticed the defendant walking toward the apartment building holding a gun.  Id.  Even though it is not necessarily illegal to carry a gun, we held that the officer had a reasonable suspicion to stop the defendant and take his gun away.  Id. at 714-15, 536 S.E.2d at 483.

> Here, police observed defendant suddenly appear, displaying a
> firearm, late at night, in an area notorious for "drug sales."
> Defendant's presence coincided with an ongoing police operation
> that involved several undercover officers in the sale of imitation
> illegal drugs, clearly an environment conducive to unlawful
> conduct and fraught with danger. . . .  Confronted with such

circumstances, police, experienced in the deadly mix of guns and narcotics and other violent crimes, reasonably suspected criminal activity which posed an immediate threat both to themselves and others, justifying a brief investigatory detention.

Id. While the decision does not expressly say so, I believe it demonstrates the way the "high crime" area factor is properly considered in the reasonable suspicion analysis. Christian identifies a situation in which suspicious activity (holding a gun), which might not justify a stop if the police witnessed it in some other place, justified a Terry stop because of where and when it occurred. It is difficult to imagine the Court upholding a Terry stop if the defendant in Christian had been holding his gun while walking from his car into a recreational shooting range.

We find another clue as to the marginal significance of a "high crime" area by comparing Goodwin with Moss v. Commonwealth, 7 Va. App. 305, 373 S.E.2d 170 (1988). The facts of Moss were very similar to the facts of Goodwin. In both cases, we held that a Terry stop was not justified by the facts and reversed the defendant's conviction. Goodwin, 11 Va. App. at 367, 398 S.E.2d at 692; Moss, 7 Va. App. at 308, 373 S.E.2d at 172. However, the stop in Moss did not take place in a "high crime" area, while the stop in Goodwin did. The Goodwin opinion still described Moss as "a case based on comparable facts . . . ." Goodwin, 11 Va. App. at 366, 398 S.E.2d at 692.

> As in Moss, the police officers, relying on their experience and instincts, saw a suspect doing something with his hands. Based primarily on that action, which they considered suspicious, they stopped the suspect. While the police are regularly required to rely on their experience and instincts, the fourth amendment requires, at a minimum, that they possess articulable facts giving rise to reasonable suspicion of criminal activity before depriving a citizen of his or her privacy or freedom of movement.

Id. at 367, 398 S.E.2d at 692.

Parsing our prior "high crime" area cases we can conclude that a defendant's presence in a high crime area has been marginally significant if accompanied by multiple hand transfers

explained to be suggestive of drug dealing by experienced officers.  See Kidd, 38 Va. App. 433, 565 S.E.2d 337.  It has been marginally significant in evaluating the behavior of someone obviously trying to hide something from the police.  See Walker, 42 Va. App. 782, 595 S.E.2d 30.  It has been highly significant if the person seized has a weapon or poses a clear danger to the police.  See Christian, 33 Va. App. 704, 536 S.E.2d 477.  At least one federal appeals court has also considered a "high crime area" significant in finding reasonable suspicion from the defendant's unexplained presence, very late at night, outside a group of closed commercial establishments.  See United States v. Briggman, 931 F.2d 705 (11th Cir. 1991).

However, a defendant's presence in a "high crime" area has not been enough to justify a stop based on a "furtive movement" by a pedestrian where the police do not see a weapon or item of contraband.  See Riley, 13 Va. App. 494, 412 S.E.2d 724; Smith, 12 Va. App. 1100, 407 S.E.2d 49; Goodwin, 11 Va. App. 363, 398 S.E.2d 690.  Nor has a motorist's presence in such an area equated the motorist's leaving a parking lot upon the arrival of the police with reasonable suspicion to conduct a motor vehicle stop.  See Ewell, 254 Va. 214, 491 S.E.2d 721.  With these cases in mind, we can address the totality of the circumstances surrounding Officer Latchman's seizure of appellant with a greater sense of perspective.

THE TOTALITY OF THE CIRCUMSTANCES:
THE MAJORITY'S ROBBERY HYPOTHESIS

While a specific offense of suspicion was never mentioned by Officer Latchman, the trial judge, or the attorney general, the majority claims to have discerned from the circumstances a reasonable suspicion that appellant was planning to commit a robbery within the Citgo station.  I believe this conclusion is untenable.  By the time the majority reaches its conclusion, the factors they find worth mentioning have grown from three to five.  These are, "the time of day, the location of Rudolph's vehicle in relation to the gas station, the recent history of burglaries and

- 20 -

robberies at that location, Rudolph's movements in that vehicle, and Rudolph's attempt to leave after a marked police vehicle pulled out from behind him . . . ," *ante* at 8.

The majority's first concern, the time of day, might be suspicious if the Citgo station had been closed. See Raab v. Commonwealth, 49 Va. App. 638, 644 S.E.2d 78 (2007); Briggman, 931 F.2d 705. Since the station was open and customers were still coming in and out, it is difficult to see how the time of day adds anything to the objective circumstances of suspicion, and the majority makes no attempt to explain why it would. The majority also fails to explain what it was about the position of appellant's car that suggested a robbery attempt. If the majority means that the car was parked next to a locked door that was not used by patrons during the evening, then their decision violates the rule that we evaluate a seizure based on the facts known to the officer at the time of the seizure. Wells v. Commonwealth, 6 Va. App. 541, 550, 371 S.E.2d 19, 23-24 (1988) (citing Terry, 392 U.S. at 21-22). Officer Latchman had no knowledge that the door near appellant was locked at the time he made the stop. Of the two other comments the majority makes about appellant's car's position, neither suggests an impending robbery. The officer stated he found it unusual that appellant had not used a marked parking space. But the majority fails to explain why parking as appellant parked would suggest to a reasonable person that appellant was preparing a robbery. Why would a robber be less likely to use a marked space than a customer? As for the majority's "easy getaway" characterization of appellant's parking place, the presence of the speed bump in the path of appellant's car seriously weakens their theory.

In light of our prior cases, the majority's reliance on appellant's "furtive movement," even when combined with the characteristics of the Citgo station, does not rise to the level of reasonable suspicion. In Riley, Goodwin, and Smith, we reversed findings of reasonable suspicion supported by "furtive movements" by pedestrians in "high crime" areas when the

- 21 -

officer did not see a weapon or item of contraband before making the stop. Riley, 13 Va. App. at 499, 412 S.E.2d at 727; Smith, 12 Va. App. at 1104, 407 S.E.2d at 52; Goodwin, 11 Va. App. at 367, 398 S.E.2d at 692. Unlike the officer in Christian, Officer Latchman did not see a weapon. Christian, 33 Va. App. at 707, 536 S.E.2d at 479. The only clear difference between this line of cases and Officer Latchman's stop of appellant is that appellant's movement took place inside a vehicle. Asble, although it did not take place in a "high crime" area, held that this kind of "furtive movement" inside a vehicle was not sufficient to justify a Terry stop. 50 Va. App. at 649, 653 S.E.2d at 288. The text of the decision does not suggest that Asble was a particularly close case. "This was, *at best, a mere hunch*, not a particularized suspicion flowing reasonably from articulable facts." Id. (emphasis added). Moreover, there is nothing the least bit suspicious about being in an automobile in the parking lot of a gas station/convenience store. Common experience suggests that it is ordinary for patrons of these establishments to be in cars and that most leave quickly after only stopping for a short period and making their purchases.

The majority's defense of its robbery hypothesis does not compare this case with any other case applying reasonable suspicion analysis to a police officer's theory that a suspect was planning a robbery. In Glover v. Commonwealth, 3 Va. App. 152, 154, 348 S.E.2d 434, 436 (1986), a police officer noticed a man sitting in his car outside a 7-11 store for about fifteen minutes before going inside.

> Once Glover was inside the store, the officer observed that he was watching the cash register and was looking at the customers in the store. Since Glover appeared to be lost, [the officer] asked him if he could be of assistance. He stated "that he was trying to locate a friend up on Jordan Street but didn't know what location." [The officer] got a map to point out the street location, but Glover, who had on a blue jogging suit, seemed more interested in the cash register than where he wanted to go. The officer noticed that Glover was sweating heavily and was nervous. Glover also pointed out to [the officer] a couple in the store and stated that they followed him into the store and that they were after him. [The

officer] thought this was suspicious because he had observed the couple in the store before Glover arrived.

Glover returned to his car, sitting in the driver's seat, where he remained for ten to fifteen minutes. He then returned to the store. The officer approached Glover again to talk with him. Again, Glover commenced to sweat heavily, acted nervous, and looked around the store. Glover purchased a soft drink and returned to the car, where he remained.

[The officer] had noted a District of Columbia license plate on the car. He testified that: "I had a feeling that subject was a person of suspicious activity, feeling that he might be wanting to rob the store." He checked the license number and found that the vehicle was owned by Bridget Thomas. He called the police department, requested a backup, and went to the parking area to investigate further.

As he approached Glover's vehicle, [the officer] noted that Glover was in the driver's seat with his right hand in a blue gym bag which was sitting on the passenger's seat beside him. Glover slowly took his hand out of the bag as [the officer] approached and [the officer] stated that he did not see anything in Glover's hand as he removed it from the gym bag. Glover acknowledged that the vehicle was registered to Bridget Thomas. He called her on the telephone, and [the officer] spoke with her and confirmed that Glover had permission to drive the vehicle. A second police officer arrived and was instructed by [the first officer] to watch Glover while he went to search the car.

Id. at 154-55, 348 S.E.2d at 436-37.

This Court held that the officer had a reasonable suspicion to conduct a stop based on his observations. Id. at 157, 348 S.E.2d at 438. Though the officer did not observe the defendant do anything illegal, this Court noted that the defendant's behavior in the store was unusual and that it was also unusual that he did not drive away after leaving the store and returning to his car. Id. In this case, the majority considers appellant's driving away from a gas station/convenience store to be a fact that strengthens their robbery hypothesis. I do not accept this reasoning in light of our comments in Glover, suggesting that it was suspicious that the defendant did *not* drive away after returning to his car.

- 23 -

Under the totality of the circumstances, appellant's behavior was much less suggestive of a robbery attempt than the behavior the officer witnessed in <u>Glover</u>. In <u>Glover</u>, the police officer carefully observed the defendant's strange, albeit legal, behavior for an extended period before conducting a <u>Terry</u> stop. <u>See</u> <u>also</u> <u>Terry</u>, 392 U.S. at 23 (officer observed two men "over an extended period of time" walking past and staring into same store window 24 times). In this case, Officer Latchman observed appellant "for a few seconds" before stopping him. Whether Officer Latchman might eventually have developed a reasonable suspicion to stop appellant's car had he carefully observed appellant's movements at greater length we will, of course, never know. I do not suggest that a few seconds of observation will never be enough to justify the stop of a vehicle. Clearly it depends on the specific facts the officer can articulate. If, for example, Officer Latchman had testified that he had seen appellant holding a firearm through the window of the vehicle, then <u>Christian</u> suggests a <u>Terry</u> stop would be appropriate. But nothing like that happened here.

The majority also mentions appellant's driving away as adding to the circumstances of suspicion. This conclusion seems inconsistent with our approach in <u>Glover</u>, as I have already explained. It is also counter-intuitive on its face. How does driving away from a Citgo station strengthen the conclusion that the driver is planning to commit a robbery within the station? Presumably, the majority would answer that it was suspicious to leave after seeing the officer. But this answer is unsatisfactory. Surely the vast majority of motorists leaving gas stations do so because they have finished their business, not to flee the police. Officer Latchman was not well positioned to say otherwise after observing appellant only for "a few seconds." His testimony provided no evidence that appellant even noticed Officer Latchman before driving away. Moreover, prior cases have reversed stops of motorists who seemed as though they were avoiding police officers in cases where that inference was considerably stronger than it is here.

- 24 -

See Bass v. Commonwealth, 259 Va. 470, 525 S.E.2d 921 (2000) (suppressing fruits of illegal stop of motorist who turned off of a street where police were conducting a sobriety checkpoint and into gas station parking lot without stopping for gas before turning onto perpendicular street, thus avoiding checkpoint). See also Murphy v. Commonwealth, 9 Va. App. 139, 384 S.E.2d 125 (1989).

Finally, Officer Latchman testified that he stopped appellant's car after he "observed the vehicle *start* moving away." (Emphasis added). Officer Latchman initiated the stop of appellant's car, "before he left the lot." This language from the testimony suggests that appellant was still within the parking lot of the Citgo station at the time Officer Latchman stopped him. For all Officer Latchman knew, appellant might not have been leaving the lot. He might have been moving his car toward one of the gasoline pumps. Thus, the majority is not merely mistaken in the emphasis they assign to appellant's leaving the parking lot. They are incorrect in determining that the record before us even supports a conclusion that this is what appellant was doing.

### A RESPONSE TO THE MAJORITY'S CONCERNS ABOUT THE REASONABLE SUSPICION STANDARD

Without analogizing this case to any prior decision finding reasonable suspicion in similar circumstances, the majority asserts that, "[t]o require a level of suspicion greater than that present in this case would be to effectively replace the requirement of reasonable suspicion with the higher standard of probable cause." *Ante* at 4-5. However, all of the following decisions expressly apply a reasonable suspicion analysis, not a probable cause analysis. Briggman, 931 F.2d at 709; Bass, 259 Va. at 477, 525 S.E.2d at 924; Ewell, 254 Va. at 217, 491 S.E.2d at 722; Asble, 50 Va. App. at 647-49, 653 S.E.2d at 287-88; Raab, 49 Va. App. at 642-43, 644 S.E.2d at 80; Walker, 42 Va. App. at 790, 595 S.E.2d at 34; Kidd, 38 Va. App. at 443, 565 S.E.2d at 342; Christian, 33 Va. App. at 714-15, 536 S.E.2d at 483; Riley, 13 Va. App. at 496-97, 412 S.E.2d at

725-26; Smith, 12 Va. App. at 1102-03, 407 S.E.2d at 51; Goodwin, 11 Va. App. at 366, 398 S.E.2d at 691-92; Moss, 7 Va. App at 308, 373 S.E.2d at 172; Glover, 3 Va. App. at 155, 348 S.E.2d at 437.

I have also mentioned that Officer Latchman did not mention the particular crime that he suspected appellant of committing. The majority's footnote 3 *ante* takes this to mean that I consider the subjective opinions of the police officer to control the reasonable suspicion inquiry. This is incorrect. Our decision in Asble, which, as I have already explained, expressly applied the objective standard of reasonable suspicion, mentioned that, ""[The police officer] identified no criminal activity of which he suspected Asble." Id. at 649, 653 S.E.2d at 288. And Asble is not the only precedent mentioning "the character of the offense under suspicion" as a relevant factor in the reasonable suspicion analysis. Christian, 33 Va. App. at 714, 536 S.E.2d at 482. See also Welsh v. Wisconsin, 466 U.S. 740 (1984) (holding some offenses may be so minor as to make it unreasonable for police to undertake searches that would be constitutionally permissible if graver offenses were suspected).

It is true that the police need not always suspect the person stopped of a particular crime for the stop to be justified. Hatcher v. Commonwealth, 14 Va. App. 487, 490, 419 S.E.2d 256, 258 (1992). But a careful review of the way we have applied this language from Hatcher convinces me that permissible Terry stops by police officers unable to articulate a particular "offense under suspicion" have generally involved flight or other obviously evasive behavior by the suspect upon encountering the police. Walker, 42 Va. App. 782, 595 S.E.2d 30 (appellant became nervous at the approach of police officers and tried to put something in his hand into the rear pocket of a woman standing to his left who refused to accept it); Alston v. Commonwealth, 40 Va. App. 728, 581 S.E.2d 245 (2003) (when police officers approached defendant in an apartment complex, defendant drove out of the parking lot with passenger officer knew was

banned from apartment complex, defendant indicated with turn signal that he would make a left turn out of the parking lot, then made abrupt right turn, pulled to the side of the road and started walking away); Hatcher, 14 Va. App. 487, 419 S.E.2d 256 (defendant drove past officer at high speed at midnight; when officer pursued defendant, defendant turned abruptly into a side street, turned off headlights, and walked about 25 feet away from the car before officer told him to stop).

Terry itself, which also applies an objective standard, emphasizes the importance of the specific offense of suspicion to meaningful judicial review. "This demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." Terry 392 U.S. at 21 n.18.

CONCLUSION

Instead of enforcing Terry's "demand for specificity," the majority holds that Officer Latchman developed reasonable suspicion, despite the vagueness of his testimony: "I don't know if he was looking around for something or what else was going on in the vehicle at the time." And it is worth repeating that they do not describe a single decision upholding a Terry stop under similar facts.

Reaching inside of a car in a gas station parking lot while the station is open for business is not suspicious. It is simply too ubiquitous and too innocent an action to justify a seizure under the Fourth Amendment without some other strong circumstance of suspicion.

> Terry does not say that seizures may be undertaken with respect to all "ambiguous" conduct; rather, Terry is grounded in the proposition that there is "no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails." Surely this balancing process, on the invasion side must take into account not only the extent of the seizure of the particular suspect stopped, but also the degree of risk to innocent persons generally if seizures upon this magnitude of suspicion are regularly permitted. Surely that is what the Court meant when it said in United States v.

> Sokolow, 490 U.S. 1, 10 (1989), that "the relevant inquiry" is into the "degree of suspicion that attaches to particular types of noncriminal acts."

Wayne R. LaFave, <u>Search and Seizure</u> § 9.5(f), at 526 (4th ed. 2004). Succinctly stated, the confluence of circumstances does not here arise to generate a reasonable, articulable suspicion of criminal activity. I believe the trial court erred in failing to grant appellant's motion to suppress. I respectfully dissent.